# EXHIBIT E

Page 1

 1 | UNITED STATES DISTRICT COURT
   | EASTERN DISTRICT OF NEW YORK
 2 | _____
   | MICHAEL GRECCO PRODUCTIONS,    )
 3 | INC.,                          )
   |                               )
 4 |         Plaintiff,            )
   |                               )
 5 |     v.                        ) Case No.
   |                               ) 18Civ.03260(PKC)(JO)
 6 | ALAMY INC. and ALAMY LTD.      )
   |                               )
 7 |         Defendants.           )
   | _____)
 8 |
 9 |
10 |
11 |
12 |
13 |
14 |        CONFIDENTIAL ATTORNEYS' EYES ONLY
15 |
16 |
17 |    VIDEOCONFERENCE DEPOSITION OF MICHAEL GRECCO
18 |        Taken Monday, September 14, 2020
19 |
20 |
21 |
22 |
23 |
24 | Stenographically Reported by:  DONNA J. RUDOLPH,
   | RPR, CA. CSR NO. 9652, NV. CCR NO. 420
25 |

## Page 2

```
 1          VIDEOCONFERENCE DEPOSITION OF MICHAEL
 2     GRECCO, taken on behalf of the defendants,
 3     commencing at the hour of 8:03 A.M., Monday,
 4     September 14, 2020, before Donna J. Rudolph, RPR,
 5     Certified Shorthand Reporter, in and for the State
 6     of California.
 7     APPEARANCES:
 8     For Plaintiff:
 9            DUANE MORRIS LLP
              BY: STEVEN M. COWLEY, ESQ.
10            100 High Street
              Suite 2400
11            Boston, Massachusetts  02110
              (857)488-4261
12            SMCowley@duanemorris.com
13     For Defendants:
14            COWAN, DeBAETS, ABRAHAMS & SHEPPARD LLP
              BY: NANCY E. WOLFF, ESQ.
15              LINDSAY R. EDELSTEIN, ESQ.
              41 Madison Avenue
16            38th Floor
              New York, New York  10010
17            (212)974-7474
              nwolff@cdas.com
18            ledelstein@cdas.com
19     Also Present:
20            Dan Gavern, Videographer
21
22
23
24
25
```

## Page 3

```
 1     MICHAEL GRECCO
 2            I N D E X
 3                                          Page
 4     By Ms. Edelstein                    8, 137
 5
 6            E X H I B I T S
 7     Number        Description            Page
 8     Exhibit A   Alamy, Inc.'s and Alamy Ltd.'s
                   Notice of Rule 30(b)(6) Deposition
 9                 of Plaintiff Michael Grecco
                   Productions, Inc., dated 6-1-20    12
10
       Exhibit B   W-2 for Grecco Photography, Inc.,
11                 for the years 1998, 1999, 2000,
                   2001, 2002, 2006, 2007, 2016       42
12
       Exhibit C   Getty Images Standard Terms and
13                 Conditions, Bates-stamped
                   MGPI003149 through MGPI003166      60
14
       Exhibit F   Aflo Supplier Agreement - Rights
15                 Managed Content, dated 9-30-12     64
16     Exhibit H   Non-Exclusive Contribution
                   Agreement, dated 6-5-12            68
17
       Exhibit K   Billing from Keswick Hamilton
18                 to Jon Lavet, dated 11 August
                   1993                               87
19
       Exhibit L   Rep. Invoice to Maggie Hamilton,
20                 dated 3-13-95                      107
21     Exhibit M   Plaintiff Michael Grecco
                   Productions, Inc.'s Supplemental
22                 Responses to Defendants Alamy
                   Inc.'s and Alamy Ltd.'s First
23                 Set of Interrogatories, dated
                   8-4-20                             109
24
25
```

## Page 4

```
 1            E X H I B I T S
 2               (Continued)
 3     Number        Description            Page
 4     Exhibit N   E-mail from Mayar, Marc, to
                   Peter Afrasiabi, dated 10-29-18    120
 5
       Exhibit O   Letter from Daid G. Oakes to
 6                 Michael Grecco, dated 12-6-94      123
 7     Exhibit P   Letter from Nathaniel Kleinman,
                   Esq., to Scott L. Whiteleather,
 8                 dated 1-11-18                      128
 9     Exhibit Q   Letter from Scott L. Whiteleather
                   to Michael Grecco, dated 9-1-17    130
10
       Exhibit R   Stock Invoice to Maggie Hamilton
11                 from Hamilton Gray, dated
                   7 July 1995                        134
12
       Exhibit W   Letter from David G. Oakes to
13                 Michael Grecco, dated 10-16-98     137
14     Exhibit Y   Certificate of Registration No.
                   VA-1-232-596, dated 9-8-03         146
15
       Exhibit Z   Certificate of Registration No.
16                 VA-1-418-417, dated 12-6-06        158
17     Exhibit A1  Posting from Copyright, United
                   States Copyright Office re
18                 Visual Material, dated 1993        164
19     Exhibit C1  Posting from Copyright, United
                   States Copyright Office re
20                 Visual Material, dated 1997        167
21     Exhibit D1  Letter from Matthew K. Higbee
                   to Paul Tash, dated 9-19-17        170
22
       Exhibit F1  Assignment Invoice to Maggie
23                 Hamilton from Michael Grecco
                   Photography, Inc., dated 6-1-97    171
24
25
```

## Page 5

```
 1            E X H I B I T S
 2               (Continued)
 3     Number        Description            Page
 4     Exhibit G1  Five slides, Bates-stamped
                   MGPI000332                         177
 5
       Exhibit H1  Certificate of Registration No.
 6                 VA-1-298-835, dated 12-3-04        178
 7     Exhibit I1  Certificate of Registration No.
                   VA-1-418-420, dated 12-6-06        183
 8
       Exhibit J1  Certificate of Registration No.
 9                 VA-1-431-698, dated 7-10-10        188
10     Exhibit K1  Certificate of Registration No.
                   VA-2-030-740, dated 1-19-17        186
11
       Exhibit L1  Certificate of Registration No.
12                 VA-2-064-915, dated 8-29-17        192
13     Exhibit M1  Assignment Invoice to Maggie
                   Hamilton from Michael Grecco
14                 Photography, Inc., dated 9-10-97   193
15     Exhibit N1  E-mail string from Michael
                   Grecco to Ellis, Chris, dated
16                 4-6-20                             197
17     Exhibit O1  Certificate of Registration No.
                   VA-1-298-833, dated 12-3-04        211
18
       Exhibit P1  Star Trek print                    213
19
       Exhibit Q1  Certificate of Registration No.
20                 VA-1-736-729, dated 7-7-10         215
21     Exhibit S1  Four spreadsheets, Bates-stamped
                   MGPI 002524 through 2539           226
22
       Exhibit T1  Supplemental Answers to
23                 Interrogatories, Exhibit 11        233
24     Exhibit V1  E-mail from Michael Grecco to
                   privacy@tan.tv, dated 11-21-16     239
25
```

**Page 86**

1  searches using TinEye and Google Images.
2     Q    What is the Higbee portal?
3     A    One of the law firms I work with has a
4  CRM, contact relationship manager, that's attached
5  to an image search engine. They use two image
6  search engines, I believe.
7     Q    Which two image search engines?
8     A    I'm not sure. I think it's Pixsy. I know
9  it's Plague Hunter.
10          MS. EDELSTEIN: Yeah. Do you want to take
11  a ten-minute break?
12          THE WITNESS: Yes, please.
13          MS. EDELSTEIN: Okay. So let's meet back
14  at 1:15.
15          THE WITNESS: No, I'm going to meet back
16  at 10:15.
17          MS. EDELSTEIN: Oh, right. Okay.
18          THE WITNESS: All right. Thanks.
19          THE VIDEOGRAPHER: We are going off the
20  record. The time is 10:04 A.M.
21          (Brief recess.)
22          THE VIDEOGRAPHER: Going back on the
23  record. The time is 10:16 A.M.
24          MS. EDELSTEIN: And we're going to
25  introduce Defendant's Exhibit K. Let's see how I'm

**Page 87**

1  doing on battery here.
2          So, Mr. Grecco, please let us know once
3  you get it.
4          THE WITNESS: It's not in yet. Oh, here
5  it is. It just came in.
6          (Exhibit K marked.)
7  BY MS. EDELSTEIN:
8     Q    And do you recognize this document?
9     A    It takes a minute to download.
10          Okay. Yes, I do.
11    Q    Okay. And what is it?
12    A    It's an invoice sent from my agent at the
13  time, Keswick Hamilton, to Fox Broadcasting for the
14  first -- very first shoot of the television show
15  X-Files.
16    Q    And how did you -- and did you take the
17  photos of this photo shoot?
18    A    I did. I've shot the X-Files three times.
19  Once for what's called the gallery shoot, which is
20  the publicity and advertising shoot for the show.
21  And twice for two different magazines.
22    Q    And what were those two magazines?
23    A    So this shoot was '93. The shoot in '94
24  was for Entertainment Weekly, who was a regular
25  client, and the shoot in '95 was for U.S.A. Weekend

**Page 88**

1  magazine.
2     Q    Okay. And is this the -- this is the
3  gallery shoot?
4     A    This is the original shoot for Fox.
5  That's correct.
6     Q    Okay. And how did you get this
7  assignment?
8     A    My work was appreciated by -- my work was
9  appreciated by one of the picture editors there.
10    Q    Okay. Do you remember that person's name?
11    A    Richard Kosters. K-o-s-t-e-r-s.
12    Q    And can you explain sort of from beginning
13  to end the process from -- from when you were first
14  assigned to work on this shoot 'til however it
15  ended.
16          MR. COWLEY: Objection as to form.
17          You may answer.
18          THE WITNESS: You know, you get a phone
19  call. They're interested in shooting. You might
20  take in-person meetings. You engage in, you know, a
21  week or two of production calls and -- and, you
22  know, production, which would mean talking to set
23  builders.
24          You know, I believe we pre-lit this set
25  the day before, which would mean there was a

**Page 89**

1  pre-light day, and then talent comes in and you
2  spend the day shooting talent.
3  BY MS. EDELSTEIN:
4     Q    Okay. And then once you -- were the
5  photos taken -- how were the photos taken? For
6  example, digitally?
7     A    1993, Counselor. On rolls --
8     Q    I --
9     A    On rolls of film with medium format
10  cameras.
11    Q    And --
12    A    Probably a couple of hundred rolls of film
13  were shot.
14    Q    And are you looking at the -- the invoice
15  right now?
16    A    I am.
17    Q    Okay. And how do you know that there were
18  approximately 100 rolls of film?
19    A    Probably more than that. But we were
20  charging 20 or 30 bucks a roll and we billed $3,000.
21  So, I mean, if I can get a calculator.
22    Q    And then once the -- the photographs were
23  taken, what happened next?
24    A    They were edited. Some remained in our
25  studio. Some images went to Fox. We billed the

Page 102

1    Q    Okay.  Thank you.
2        MR. COWLEY:  What are we calling that?
3    Are you going to mark it Exhibit D?
4        MS. EDELSTEIN:  Yes.
5        MR. COWLEY:  And we, throughout the case,
6    refer to the corrected version of Exhibit A to the
7    amended complaint.  Can we agree that that's what
8    you just showed him.
9        MS. EDELSTEIN:  Yes.
10   Q    Okay.  So -- so what rights did you
11   have -- or what did Michael Grecco Productions,
12   Inc. -- rights did they have in these images as of
13   1993?
14   A    We're talking about the two images ending
15   in 417?
16   Q    Yes.
17   A    And repeat the question.
18   Q    What rights did -- did you have in these
19   images in 1993?
20   A    I have all the rights to them.
21   Q    So did you have the right to use them for
22   merchandising?
23   A    Well, merchandising would have required a
24   model release and/or permission from the network.
25   You don't have the right to use any image for

Page 103

1    merchandising without a model release.
2        So as far as the copyright goes, yes, I
3    did.  If someone came to me and had the model
4    release or agreement from the network, yes, I did
5    have the right.  You know, specifically as you see
6    the invoice to Delphi Network that was submitted to
7    you for $5,000, they had permission from Fox to use
8    the picture, and I licensed them that photograph.
9    Q    So if you didn't have the model release,
10   then what types of ways could you use these images?
11   A    In every way as long as the models or the
12   network approved or for editorial use without --
13   without model permission.
14   Q    And what rights did Fox have in the
15   images?
16   A    They had the right -- the nonexclusive
17   right to use these images to publicize and advertise
18   the show.
19   Q    And do you know if -- if Fox used the
20   images for advertising or publicity purposes, did
21   they need to include a credit to you?
22   A    My contract says they had to credit me and
23   in most cases they did.  They put my name on the --
24   on the slide.  Remember, images back then were
25   distributed as physical prints and copy slides.

Page 104

1    Q    Did you ever see an instance where your
2    name was not included on one of the slides?
3    A    Not from Fox.  I mean, I've seen my name
4    not included by other people who have swiped these
5    images.  But most of the -- most -- and from my
6    recollection, most of the images that I've seen Fox
7    put out had a credit on them.  I should say most, if
8    not all, that I've seen.
9    Q    Do you know what the copyright notice said
10   on the slides?
11   A    Probably, even though it was improper,
12   they probably put 20th Century Fox first and then my
13   name afterwards.
14   Q    Did you ever contact Fox about that?
15   A    No.
16   Q    Why not?
17   A    Because you're not going to have a fight
18   with your client about how they -- how they decide
19   to protect their -- their work.  I mean, the -- I
20   guess the overall concept of that is that it's their
21   show, and they're letting people know that it's
22   their property.  The show is their property.
23       MS. EDELSTEIN:  Okay.  So we're going to
24   introduce Exhibit L.
25   A    Is it coming my way?

Page 105

1    Q    Just one second.
2        (An off-record discussion was held.)
3        MS. EDELSTEIN:  Okay.  So yeah.  Here's
4    Exhibit L, and it's Bates numbers MGPI 000322
5    through MGPI 000323.
6        (Exhibit L marked.)
7    BY MS. EDELSTEIN:
8    Q    So, Mr. Grecco, please let us know once
9    you've received it and if you recognize this
10   document.
11   A    I do.
12   Q    And what is this document?
13   A    It's an invoice for the third X-Files
14   shoot in 1995.
15   Q    Okay.  And going back to Exhibit D -- or
16   does this -- did you take the image ending in
17   registration No. 596 at this shoot?
18   A    Yes.  That's correct.  What we referred to
19   as the flashlight picture.
20   Q    The flashlight picture.
21       Where did you get this document, Exhibit
22   L?
23   A    I think we had a printed copy in our -- in
24   our files or it came off the computer.  This is the
25   original invoice to my agent for this job for U.S.A.

Page 114

1  A  Just what it sounds like, a notice of
2 inquiry.
3  Q  Does it include any sort of demand?
4  A  No financial demand.  It's usually, if you
5 don't have the right, there's a cease and desist
6 component to it.  And it doesn't -- doesn't ask for
7 a demand up front.
8  Q  So there wouldn't have been a monetary
9 amount included in that -- in that --
10  A  I don't believe -- I don't believe at that
11 stage.  But every firm handles their cease and
12 desist and notice of inquiries differently.  I don't
13 have that cease and desist specifically in front of
14 me.  It wasn't part of our interrogatories.
15       So if you show it to me, I can see.  But I
16 don't think there -- I don't think there was an
17 initial demand.
18  Q  And how did Fox pick the 14 photographs?
19       MR. COWLEY:  Objection to form.
20       You may answer.
21       THE WITNESS:  I have no idea.  I wasn't
22 part of that process.
23 BY MS. EDELSTEIN:
24  Q  Did you limit the photographs that they
25 could choose between?

Page 115

1  A  Yes.  They were able -- they -- they --
2 when they realized they didn't have merchandising
3 rights or anything that -- that went beyond the
4 advertising and publicity of the show, and they
5 wanted merchandising rights, they came back to me
6 and asked if they could do a merchandising
7 buy-out -- and it was strictly for merchandising --
8 of 14 images.
9       And they asked if they could select images
10 from all three shoots and we agreed.  In the
11 negotiation with my agent, they expanded it -- that
12 was -- I had worked with David Oakes, the attorney
13 from Fox, in that license.
14       And when he came to my agent, my agent was
15 willing to expand that to 14 images.  It was
16 originally 12.  But I have no -- I was not involved
17 in their process of picking images.
18  Q  And were any of those 14 images originally
19 in the complaint in this action?
20  A  Yes.
21  Q  Is that why you withdrew those images from
22 the complaint?
23  A  Yes, because we supplement- -- as part of
24 that settlement, we supplementally -- supplementally
25 went from giving them merchandising rights to a

Page 116

1 transfer of copyright to those 14 images.
2  Q  And why did you do that?
3  A  Because they asked for it.  Because it was
4 part of a -- give and take of a negotiation.
5 Because we thought it would be valuable to have a
6 definitive writing about who owns what.
7  Q  So --
8  A  For cases like this.
9  Q  So what you had before was not a
10 definitive writing?
11       MR. COWLEY:  Objection as to form.
12       You may answer.
13       THE WITNESS:  Yeah, I don't think my
14 agent's words "advertising and publicity shoot" are
15 probably as descriptive as they could be.
16 BY MS. EDELSTEIN:
17  Q  And what did you get from the agreement
18 with Fox if they got the -- transfer of rights
19 of the 14 images?
20  A  A clearly defined agreement that states
21 that we have co-exclusive rights, that I have the
22 right to license these images, and that I had the
23 right to license the images prior to the agreement.
24  Q  Are you aware whether Fox had ever
25 distributed the photos from the gallery shoot as

Page 117

1 publicity handouts?
2       MR. COWLEY:  Objection as to form.
3       You may answer.
4       THE WITNESS:  That was the purpose of the
5 shoot.  The purpose of the shoot was to send out the
6 images to the particular magazines and publications
7 that Fox knew was -- were doing a review of the
8 show.
9 BY MS. EDELSTEIN:
10  Q  And do you know how the publicity handouts
11 appeared when they were sent out?
12  A  They were usually in duplicate slide form
13 and 8-by-10 prints.
14  Q  And are you aware whether there are any
15 restrictions regarding the use that were explained
16 in the publicity handouts?
17       MR. COWLEY:  Object as to form.
18       THE WITNESS:  We can hardly hear you,
19 Steve.
20       MR. COWLEY:  Objection as to form.
21       You may answer.
22       THE WITNESS:  I -- I know there are terms
23 and texts on many of those images about what could
24 be done with the pictures and what can't.  I can't
25 recite it to you right now.  But there were -- there

Page 118

1   were restrictions on -- they were restrictions on
2   how the images can get used.
3   BY MS. EDELSTEIN:
4       Q    And are you aware of what any of those
5   were?
6           MR. COWLEY:  Objection as to form.
7           You may answer.
8           THE WITNESS:  Asked and answered,
9   Counselor.  I -- I don't have the -- I don't have
10  the text in front of me.
11  BY MS. EDELSTEIN:
12      Q    I believe you said you couldn't recite
13  them.  But do you have any idea of -- of what they
14  were?  And if the answer is no, that's fine.
15      A    No, I don't.
16      Q    Do you know if there was any time
17  restriction noted in the publicity handout?
18          MR. COWLEY:  Objection as to form.
19          You may answer.
20          THE WITNESS:  Time restriction for the
21  publicity to use it?
22  BY MS. EDELSTEIN:
23      Q    Correct.
24      A    I don't.  I -- I -- I don't have -- I
25  don't have the images in front of me and -- and the

Page 119

1   text that goes out.  But, in general, the network
2   controls who uses those pictures and if they're
3   going to write a favorable story about their show.
4   And they want the publicity from that particular
5   newspaper or magazine.
6           So, in general, it's up to the network who
7   gets pictures, not up to a third-party agency who
8   decides to steal them to distribute them to anyone
9   who pays.
10  BY MS. EDELSTEIN:
11      Q    And do you know if -- if the publicity
12  handouts were -- were free?
13          MR. COWLEY:  Objection as to form.
14          You may answer.
15          THE WITNESS:  When Fox gave them out for
16  promotion of the show, I believe there are instances
17  that they're free.  I also know that Fox
18  Broadcasting has a licensing department for which
19  they charge money for the use of those images.
20  BY MS. EDELSTEIN:
21      Q    And have you ever seen a license issued by
22  Fox's licensing department --
23          MR. COWLEY:  Objection --
24  BY MS. EDELSTEIN:
25      Q    -- out of respect to -- to any X-Files

Page 120

1   images?
2           MR. COWLEY:  Objection as to form.
3           You may answer.
4           THE WITNESS:  I -- I am not privy to any
5   of the inner workings of Fox of how they distribute
6   images for press or license images.
7   BY MS. EDELSTEIN:
8       Q    All right.  So --
9           (An off-record discussion was held.)
10          MS. EDELSTEIN:  All right.  So let's
11  discuss -- or we'll introduce Defendant's Exhibit N,
12  which bears Bates numbers MGPI 002743 to MGPI
13  002744.
14          (Exhibit N marked.)
15  BY MS. EDELSTEIN:
16      Q    Let us know when you've received it and if
17  you recognize it.
18      A    Okay.  Okay.  I've -- I've seen it.
19      Q    And do you recognize this -- this
20  correspondence?
21      A    I do.
22      Q    And are any of the individuals listed
23  there your attorneys?
24      A    Yeah.  The attorneys from One, LLP.  So
25  Peter Afrasiabi and Vish who was there at the time.

Page 121

1       Q    And is this part of the correspondence you
2   were referencing with respect -- that -- that
3   followed after the notice of inquiry?
4       A    No, I think this was another one.
5   There -- there was a -- Fox had cited a -- Fox had
6   cited a letter from Higbee & Associates, not One,
7   LLP, when they reached out to us to handle this.
8       Q    Just to break that down a little, do you
9   know -- well, first of all, do you know -- did this
10  have to do with the gallery shoot as well?
11      A    I don't see an image attached here, so I'm
12  not going to give testimony to what image it was.
13  They could have been out of their minds and it could
14  not -- you know, they could have just been clearly
15  wrong and it not be -- it could have not be -- been
16  something that -- I'm looking at these past
17  documents with reference numbers on them now.
18          But since I don't know that VA No. 741,
19  I'm not sure what image it is.  And I don't know if
20  it was gallery or Entertainment Weekly or U.S.A.
21  Weekend.
22      Q    Okay.  We should have 741.  So let's take
23  a look.
24      A    Many people make the wrong assumption that
25  things I shot for magazines, which are 100 percent

Page 262

1  book and documentary film called "Naked Ambition"
2  which is about to come down.  I've got two startups
3  which don't have their websites up yet.
4      Q    What about
5  mgpstockphotos.photoshelter.com?
6      A    Yes, we have that website also.  I don't
7  host it.  I think your question asked what do you
8  host.  I don't host that website.
9      Q    So what is your connection to that
10  website?
11     A    It's just hosted by PhotoShelter.  That's
12  all.  I don't host it.  I specifically answered your
13  question, and your question wasn't broad enough.
14  You asked me what websites I hosted.
15     Q    Okay.  And do you put images available for
16  license on michaelgrecco.com?
17     A    No.
18     Q    Do you put images available for license on
19  mgp.stockphotos.com -- or the PhotoShelter website?
20     A    Yes.  On mgpstockphotos.com.  Correct.
21     Q    And do you have any other websites that
22  you are associated with?
23     A    I'm the founder of ASCRL, you know, which
24  is an independent organization.  I'm on the
25  executive board.  I created the organization.  I

Page 263

1  don't think so.  But I -- I -- I'm an entrepreneur.
2  I have my fingers in lot of businesses.
3      MS. EDELSTEIN:  All right.  I think that
4  that is -- that's it on our end.
5      THE WITNESS:  Cool.
6      MR. COWLEY:  You're all set.
7      THE WITNESS:  You -- you -- don't you need
8  to say your thing and --
9      MR. COWLEY:  Oh, I'm sorry.  On the
10  record, yes.
11      As of the completion of the testimony from
12  the beginning to the end should -- should be
13  designated attorneys' eyes only until we're given an
14  opportunity after we review and -- excuse me --
15  receive and review the transcript to designate a
16  smaller subset.
17      But there's been testimony about
18  attorneys' eyes only documents and information
19  throughout the -- deposition today.  So we need
20  to start by designating it all as such.
21      MS. EDELSTEIN:  We consent to that.
22      THE WITNESS:  Thanks, everyone.
23      THE REPORTER:  Mr. Cowley, do you want to
24  just put your copy order on the record, because
25  that's fine with me.

Page 264

1      MR. COWLEY:  Yeah, I --
2      THE VIDEOGRAPHER:  And can you order, too,
3  please, Counsel.
4      MR. COWLEY:  I'm sorry.  I didn't hear
5  what you said.
6      THE VIDEOGRAPHER:  Who would like to order
7  the video?
8      MS. EDELSTEIN:  Oh, we do.  Defendants'
9  counsel.
10      THE VIDEOGRAPHER:  Okay.
11      And, Mr. Cowley?
12      MR. COWLEY:  No.  Thanks.  In response to
13  your question, I -- I sent the e-mail earlier.
14      THE REPORTER:  Okay.  I didn't have a
15  chance to read it.  That'll work.
16      MR. COWLEY:  It's in the e-mail.  If
17  there's any question, just send me an e-mail.
18      THE REPORTER:  Okay.  No problem.  Thank
19  you.
20      THE VIDEOGRAPHER:  This concludes the
21  deposition of Michael Grecco.  We're going off the
22  record.  The time is 4:21 P.M.
23      (The deposition concluded at 4:21 P.M.)
24
25

Page 265

1  DECLARATION UNDER PENALTY OF PERJURY
2
3
4      I, MICHAEL GRECCO, do hereby certify under
5  penalty of perjury that I have read the foregoing
6  transcript of my deposition taken on September 14,
7  2020; that I have made such corrections as appear
8  noted on the Deposition Errata Page, attached
9  hereto, signed by me; that my testimony contained
10  herein, as corrected, is true and correct.
11
12      Dated this _____ day of _____,
13  2020, at _____, California.
14
15
                                _____
16                              MICHAEL GRECCO
                                Deponent
17
18
19
20
21
22
23
24
25

Page 266

1   UNITED STATES DISTRICT COURT
2   FOR THE CENTRAL DISTRICT OF CALIFORNIA
3           I, DONNA J. RUDOLPH, RPR, CSR No. 9652,
4   Certified Shorthand Reporter, certify:
5           That the foregoing proceedings were taken
6   before me at the time and place therein set forth,
7   at which time the witness was put under oath by me;
8           That the testimony of the witness, the
9   questions propounded, and all objections and
10  statements made at the time of the examination were
11  recorded stenographically by me and were thereafter
12  transcribed;
13          That a review of the transcript by the
14  deponent [was not] requested;
15          That the foregoing is a true and correct
16  transcript of my shorthand notes so taken.
17          I further certify that I am not a relative
18  or employee of any attorney of the parties, nor
19  financially interested in the action.
20          I declare under penalty of perjury under
21  the laws of California that the foregoing is true
22  and correct.
23          Dated this 20th day of September, 2020.
24  _____
    Donna J. Rudolph, RPR
25  CA CSR No. 9652, NV CCR No. 420

Page 267

1
2           E R R A T A   S H E E T
3           I, MICHAEL GRECCO, do hereby certify that I
4   have read the foregoing transcript of my testimony, and
5   further certify that it is a true and accurate record
6   of my testimony (with the exception of the corrections
7   listed below).
8   PAGE  LINE    CORRECTION
9   ____  ____    _____
10  ____  ____    _____
11  ____  ____    _____
12  ____  ____    _____
13  ____  ____    _____
14  ____  ____    _____
15  ____  ____    _____
16  ____  ____    _____
17  ____  ____    _____
18  ____  ____    _____
19  ____  ____    _____
20  ____  ____    _____
21  ____  ____    _____
22  ____  ____    _____
23  ____  ____    _____
24
    _____     _____
25  Date                    MICHAEL GRECCO