UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL GRECCO PRODUCTIONS, INC., | |
| *Plaintiff*, | 1:18-cv-03260 (PKC)(RER) |
| -against- | |
| ALAMY INC. AND ALAMY LTD., | |
| *Defendants*. | |

## DEFENDANTS ALAMY INC.'S AND ALAMY LTD.'S RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Rules for the United States District Court for the Eastern District of New York (the "Local Rules"), defendants Alamy Inc. and Alamy Ltd. (together with Alamy Inc., "Defendants") respectfully submit the following Counterstatement to plaintiff Michael Grecco Productions, Inc.'s ("MGPI" or "Plaintiff") Statement of Additional Material Facts To Be Tried.

1.     In June 2019, at a time when discovery in this action was phased to focus in the first instance on a jurisdictional issue raised by Defendants, the Plaintiff served a Notice of Taking The Deposition of Defendant Alamy, Inc. (then the only Defendant) Pursuant To FRCP 30(b)(6) on a range of topics addressing the relationship between and operations of Alamy, Inc. and Alamy Ltd. Cowley Decl. ¶ 3 and Ex. 1.

**Defendants' Response**: Undisputed that Plaintiff served a Notice of Taking a Rule 30(b)(6) Deposition of Alamy Inc. on June 11, 2019 to address various topics, including the relationship between and operations of Alamy Inc. and Alamy Ltd. (Cowley Decl. ¶ 3, Ex. 1), but disputed to the extent that discovery was, at that time, primarily focused on a jurisdictional issue raised by Defendants, as Alamy Inc. was the then-sole defendant in the action. Alamy Inc. had

1

raised various affirmative defenses in its Answer to the Initial Complaint, including, among others, that it was the wrong party to the action and that Plaintiff failed to sufficiently allege personal jurisdiction. (ECF No. 34 at 7-10.)

2.    Alamy, Inc. designated both Jane Serember and John Schilizzi to testify about the topics in Plaintiff's Notice, roughly dividing the topics between issues on which Alamy, Inc. possessed information and on which Alamy Ltd. possessed the information. Cowley Decl. ¶ 4 and Ex. 2.

**Defendants' Response:** Undisputed that Alamy Inc.'s counsel corresponded with counsel for Plaintiff regarding Alamy Inc.'s designation of two Rule 30(b)(6) designees, Jane Serember and John Schilizzi, to testify based on their background and expertise on a division of topics from Plaintiff's Notice, but disputed to the extent that the topics were divided. (Cowley Decl. ¶ 4, Ex. 2.) Although Alamy Inc.'s counsel specified various topics to be covered by Ms. Serember and Mr. Schilizzi, they also specified that Plaintiff's counsel could question Ms. Serember on topics about which she was formerly designated to testify. (*Id.*)

3.    In August 2020, with Defendant Alamy Ltd. added as a party in an intervening Amended Complaint, Plaintiff served a Second Notice of Taking The Deposition of Defendant Alamy Inc. Pursuant To Fed. R. Civ. P. 30(b)(6) and a Notice of Taking The Deposition of Defendant Alamy Ltd. Pursuant To Fed. R. Civ. P. 30(b)(6). Cowley Decl. ¶¶ 7-8 and Exs. 5-6.

**Defendants' Response:** Undisputed that on October 10, 2019, Plaintiff added Alamy Ltd. as a party in its Amended Complaint (ECF No. 58) and subsequently served a Second Notice of Taking the Deposition of Defendant Alamy Inc. pursuant to Fed. R. Civ. P. 30(b)(6) to Alamy Inc., as well as a first Notice of Taking the Deposition of Defendant Alamy Ltd. Pursuant to Fed. R. Civ. P. 30(b)(6) to Alamy Ltd., in August 2020. (Cowley Decl. ¶¶ 7-8, Exs. 5-6.)

4.      John Schilizzi was identified as the corporate designee on behalf of both Defendants to testify on all topics identified in the Rule 30(b)(6) Notices served in August 2020. Cowley Decl. ¶ 9 and Ex. 7.

**Defendants' Response:** Undisputed that John Schilizzi virtually testified at a September 25, 2020 deposition in his capacity as finance director and company secretary of Alamy Ltd. and secretary, treasurer, and director of Alamy Inc. and in connection with the deposition topics listed in Plaintiff's August 20, 2020 Notice of Deposition. (Declaration of Nancy E. Wolff dated September 11, 2023 ("Wolff 9/11 Decl.") ¶ 4, Ex. K at 5:13-22, 6:8-7:9; Cowley Decl., Ex. 6.)

5.      At the time of her deposition on September 5, 2019, Jane Serember held the position of General Manager of North America and Australia / New Zealand, leading the eleven-person team working for Alamy, Inc. Cowley Decl. Ex. 3, Serember Tr. 5:18-24.

**Defendants' Response:** Undisputed that Jane Serember testified at a September 5, 2019 deposition that she was the general manager of Alamy Inc. North America and Australia/New Zealand, and that there were eleven other employees on the payroll of Alamy Inc. at that time, including a team led by Ms. Serember comprised of an administrative office manager and ten account managers. (Wolff 9/11 Decl. ¶ 6, Ex. M at 5:21-24, 13:12-14:8, 15:9-16:13.)

6.      Ms. Serember's role was to lead a sales team of ten account managers, and one office administrator, "to raise awareness and educate potential clients to engage with and buy from Alamy.com." Her focus was entirely on sales. Cowley Decl. Ex. 3, Serember Tr. 13:12-18; 15:9-17; 45:2-21.

**Defendants' Response:** Undisputed that as Alamy Inc.'s General Manager, Ms. Serember led a sales team, which included ten account managers, and one office administrator, focusing on

"rais[ing] awareness and educat[ing] potential clients to engage with and buy from Alamy.com." (Wolff 9/11 Decl., Ex. M at 13:12-18, 15:9-17, 45:10-21.)

7.      Ms. Serember's direct superior was Alan Capel, Chief Commercial Officer of Defendant Alamy Ltd. Cowley Decl. Ex. 3, Serember Tr. 21:7-10.

**Defendants' Response:** Disputed to the extent that Ms. Serember did not state that Alan Capel was her direct supervisor, but rather that she reported to Alan Capel, Alamy Ltd.'s Chief Commercial Officer. (Wolff 9/11 Decl., Ex. M at 21:7-10.)

8.      Even though she was Alamy, Inc.'s most senior employee, Ms. Serember had no responsibility in connection with Alamy, Inc.'s bank account, she did not know how many it might have, and did not even know who was authorized to make withdrawals from the Alamy, Inc. bank account. Ms. Serember did not believe anyone at Alamy, Inc. had such authority. Cowley Decl. Ex. 3, Serember Tr. 22:10-23; 27:4-16; 121:5-15.

**Defendants' Response:** Misleading and immaterial. Ms. Serember never claimed to be Alamy Inc.'s most senior employee. Moreover, Plaintiff had the opportunity to question, and did question, Mr. Schilizzi regarding Alamy Inc.'s bank account, who as secretary for Alamy Inc. and informally acting as Alamy Inc.'s treasurer, as well as company secretary and chief financial officer for Alamy Ltd., was more equipped to discuss these topics. (Wolff 9/11 Decl. ¶ 3, Ex. J at 5:18-23, 33:4-7, 40:3-9, 58:16-66:9, 70:13-21.) Plaintiff's questions regarding Alamy Inc.'s bank accounts and payroll structure addressed to Ms. Serember at her deposition exceeded the scope of the parties' counsels' agreed-upon witness and topic designations. Immaterial as Ms. Serember's knowledge of these topics or control thereof does not inform any purported lack of corporate distinction between Alamy Inc. and Alamy Ltd. (Wolff 9/11 Decl., Ex. M at 22:10-23; 27:4-16;

121:5-15.) Moreover, Ms. Serember did discuss managing various aspects of her team's financial compensation, including overseeing sales reports and quarterly sales bonuses. (*Id*. at 40:18-42:6.)

      9.      Payroll for Alamy, Inc. was managed by an employee of Alamy Ltd. Cowley Decl. Ex. 3, Serember Tr. 28:5-18.

      **Defendants' Response**: Disputed to the extent that Ms. Serember testified that it was her belief that an Alamy Ltd. employee managed payroll for Alamy Inc. staff. (Wolff 9/11 Decl., Ex. M at 28:5-18.) Misleading and immaterial as such payment management does not inform any purported lack of corporate distinction between Alamy Inc. and Alamy Ltd.

      10.     The systems on which Alamy, Inc. sales operations were run, including a CRM system, Salesforce and a billing system, were all managed and run by Alamy Ltd. or India employees. Cowley Decl. Ex. 3, Serember Tr. 41:22-43:25; 45:2-21.

      **Defendants' Response**: Undisputed that Alamy Inc. used a CRM system, SalesForce, to track sales data (Wolff 9/11 Decl., Ex. M at 36:21-37:5) but disputed to the extent that Ms. Serember stated numerous times during her deposition testimony on Alamy Inc.'s billing and sales systems that this information was not within her jurisdiction and may have been incorrect. (*Id*. at 41:7-21, 45:1-21.) Immaterial as Alamy India is neither a party to this action nor does its corporate structure bear upon any of Plaintiff's claims.

      11.     All of the Human Resources functions relating to Alamy, Inc. were performed by Alamy Ltd. employees. Cowley Decl. Ex. 3, Serember Tr. 82:3-14.

      **Defendants' Response**: Undisputed that Ms. Serember stated that to her knowledge, Alamy Inc. did not employ human resources staff and that human resources functions for Alamy Inc. were performed by Alamy Ltd. employees. (Wolff 9/11 Decl., Ex. M at 82:3-11.) Misleading

to the extent that Ms. Serember stated that Alamy Ltd.'s human resources director was, in fact, a global HR director for Alamy Ltd. (*Id*. at 18:18-19:7, 70:13-22.)

12.     Ms. Serember was not aware whether Alamy, Inc. pays anything to Alamy Ltd. for managing those operational functions. Cowley Decl. Ex. 3, Serember Tr. 79:19-22.

**Defendants' Response**: Undisputed that Ms. Serember was not aware of whether Alamy Inc. paid Alamy Ltd. for functions it provided. (Wolff 9/11 Decl., Ex. M at 79:19-22.) Misleading and irrelevant in that, as Ms. Serember testified, her role was limited to running Alamy Inc.'s sales team and driving sales revenue, and, as Plaintiff was aware, Defendants' officer, John Schilizzi was designated as the appropriate deponent on this issue. (*Id*. at 80:2-15.)

13.     Alamy, Inc. had no finance, accounting staff or controller of its own. Cowley Decl. Ex. 3, Serember Tr. 94:11-96:10; 96:14-19.

**Defendants' Response**: Disputed, as Ms. Serember testified that to her knowledge Alamy Inc. did not employ its own finance or accounting staff, or have a controller. (Wolff 9/11 Decl., Ex. M at 96:14-19.) Misleading and irrelevant, for as Ms. Serember stated, her role pertained to running Alamy Inc.'s sales team and driving sales revenue, not overseeing, managing, or otherwise keeping track of Alamy Inc.'s financial operations. (*Id*. at 80:2-15.)

14.     Ms. Serember, Alamy, Inc.'s General Manager, had no knowledge how its rent is paid. Cowley Decl. Ex. 3, Serember Tr. 104:5-14.

**Defendants' Response**: Undisputed that Ms. Serember was unaware as to how Alamy Inc. paid rent for its Brooklyn office. (Wolff 9/11 Decl., Ex. M at 104:5-14.) Misleading in that Ms. Serember's role as Alamy Inc.'s general manager as to sales and sales revenue did not encompass managing Alamy Inc.'s property rental. (*Id.* at 80:2-15.)

15.    Even though James West is identified in Alamy, Inc.'s New York corporate registration, Ms. Serember was not aware whether he had any role at the company. Cowley Decl. Ex. 3, Serember Tr. 21:7-10.64:15-25, Ex. 11 (Rule 30(b)(6) Depo. Ex. 5).

**Defendants' Response:** Undisputed that Ms. Serember did not know whether James West had a position or role with Alamy Inc., as she stated that she did not interact with Mr. West on a daily basis. (Wolff 9/11 Decl., Ex. M at 64:15-25.) Misleading in that Ms. Serember testified that she was not surprised to hear Mr. West identified as Alamy Inc.'s CEO, inasmuch as he was listed as such on State of New York incorporation documents. as it would not be unusual to have a global CEO for the company and (*Id*. at 114:23-117:5.)

16.    Ms. Serember was not aware who was an officer of Alamy, Inc. Cowley Decl. Ex. 3, Serember Tr. 79:23-80:12.

**Defendants' Response:** Undisputed that Ms. Serember was not aware of the officers of Alamy Inc. (Wolff 9/11 Decl., Ex. M at 79:23-80:12.) Misleading in that Ms. Serember's role with Alamy Inc. pertained to serving as its general manager overseeing sales and revenue generation, which did not require in-depth knowledge of Alamy Inc.'s corporate structure, nor denote the lack thereof. (*Id*. at 80:2-15.)

17.    Ms. Serember was not aware of the existence of Alamy, Inc. ByLaws, nor of any Board of Directors or meetings of a Board. Cowley Decl. Ex. 3, Serember Tr. 109:9-114:2; Ex. 13 (Rule 30(b)(6) Depo. Ex. 4).

**Defendants' Response:** Undisputed that Ms. Serember was unaware that Alamy Inc. had bylaws or a board of directors which held meetings. (Wolff 9/11 Decl., Ex. M at 109:9-114:2.) Misleading in that Ms. Serember's role with Alamy Inc. was limited to serving as its general manager overseeing sales and revenue generation, which did not require in-depth knowledge of

Alamy Inc.'s corporate structure, nor denote the lack thereof. (*Id*. at 80:2-15.) Moreover, Plaintiff was aware that Ms. Serember was not the deponent designated by Alamy Inc. to discuss its corporate structure, including bylaws and board members and operations. (*Id*. at 111:5-10.)

18.     Ms. Serember considered her role as General Manager of Alamy, Inc. to be limited to running the sales team and driving revenue. Cowley Decl. Ex. 3, Serember Tr. 79:23- 80:12.

**Defendants' Response:** Disputed and misleading to the extent that Ms. Serember did not merely consider her role as Alamy Inc.'s general manager to be limited to running the sales team and driving revenue, but that this was, indeed, her main role with Alamy Inc. (Wolff 9/11 Decl., Ex. M at 11:12-20, 45:19-21, 79:23-80:12.) She additionally testified that her position with Alamy Inc. consisted of her role as general manager of North America and Australia and New Zealand, leading to responsibilities for both markets and businesses. (*Id.* at 5:21-6:9). Within the scope of this position, her role was to lead a team of account or sales managers to raise awareness and educate potential clients to engage with and buy from alamy.com. (*Id.* at 13:12-18).

19.     Even though she was General Manager of Alamy, Inc., Ms. Serember had no access to any company profit or loss projections. Cowley Decl. Ex. 3, Serember Tr. 97:11-21.

**Defendants' Response:** Disputed. Ms. Serember never stated that she could not access company profit or loss projections, but rather that the budget that she reviewed in 2019 did not list an outright projected profit by Alamy Inc. for year's end, though she could have calculated that figure based on data included in the budget which showed projected revenue and costs. (Wolff 9/11 Decl., Ex. M at 97:11-98:7.)

20.     Ms. Serember had no knowledge of an inter-company loan between Alamy, Inc. and Alamy Ltd., and she was never informed how such a loan or any required repayment would affect the budget for Alamy, Inc. that she helps prepare to manage sales representatives' targets.

Cowley Decl. Ex. 3, Serember Tr. 85:11-88:4; 118:25-120:23, and Exs. 14-15 (Rule 30(b)(6) Depo Exs. 6-7).

**Defendants' Response:** Undisputed that Ms. Serember's sales management role involved tracking Alamy Inc.'s budget (Wolff 9/11 Decl., Ex. M at 85:11-18) and that she was unaware of an intercompany loan between Alamy Inc. and Alamy Ltd. (*Id.* at 119:15-18). Misleading and immaterial in that Ms. Serember agreed upon and worked directly on the budget for Alamy Inc. with Alan Capel. (*Id*. at 83:14-84:16.) Also misleading to the extent that within the scope of Ms. Serember's sales management position, Ms. Serember did handle Alamy Inc.-based budgetary matters herself, directly from the Alamy Inc. office and accounting for costs to Alamy Inc., including hiring additional staff. (*Id*. at 82:15-83:13.)

Additionally immaterial as Ms. Serember's awareness of the particulars of a loan agreement between Alamy Inc. And Alamy Ltd. does not bear upon the function of the Alamy Inc. office as a separate corporate entity with its own U.S.-based employees, office, bank account, and tax obligations, nor Ms. Serember's role as its general manager. (Declaration of James Allsworth ("Allsworth Decl.") ¶ 10.) Not only was the agreement scheduled to terminate shortly after the time of Ms. Serember's deposition, but, as Plaintiff failed to ascertain, there was not clearly any outstanding principal and interest due upon termination that might have affected Alamy Inc.'s budget. (Serember Tr. at 119:15-120:19.)

21.    Management of Alamy, Inc. customer accounts is handled by Alamy India employees. Cowley Decl. Ex. 3, Serember Tr. 101:12-23.

**Defendants' Response:** Disputed. As Ms. Serember testified, Alamy India's billing and finance staff only determined clients' financial eligibility where such clients wished to pay an invoice via bank transfer, rather than credit or debit card. (Wolff 9/11 Decl., Ex. M at 101:7-23.)

Alamy Inc. continued to oversee rates for its client accounts, beyond the initial determination of client eligibility to pay via this method. (*Id*. at 101:17-23.)

22.    Alamy, Inc. customers in the United States receive invoices stating that they come from Alamy, Inc., but they are issued by Alamy Ltd.'s billing group in India. Cowley Decl. Ex. 3, Serember Tr. 100:5-17.

**Defendants' Response:** Undisputed that Alamy Inc. invoices were originally generated by billing staff in India, but misleading to imply that customers' U.S. invoices did not actually come from Alamy Inc., as such invoices reflected rates set by Alamy Inc. measured in U.S. currency, to be processed through Alamy Inc.'s bank account. (Wolff 9/11 Decl., Ex. M at 100:5-17, 101:12-18.) Substantively, Alamy Inc. invoices were governed by Alamy Inc.'s office, notwithstanding the physical generation of the invoices, based on Alamy Inc. input and oversight, by the Alamy India office. (*Id*. at 100:11-17, 101:12-18)

23.    Ms. Serember was not aware that invoices were being sent to customers alleging unauthorized use of images from the alamy.com website and that those invoices demanded payment by check to the Alamy, Inc. office. She had no idea how any employee of Alamy, Inc. would deposit a check sent to the office. Cowley Decl. Ex. 3, Serember Tr. 206:22-213-17, Exs. 23-24 (Rule 30(b)(6) Depo. Exs. 15-16).

**Defendants' Response:** Undisputed that Ms. Serember was not familiar with a particular email exchange between an Alamy billing email address, billing@alamy.com, and a customer, Lisanne Harrington, (Wolff 9/11 Decl., Ex. M at 206:22-208:6), but misleading and immaterial as Ms. Serember was not employed by Alamy Inc. at the time this correspondence occurred, nor had she, during her tenure as general manager, had personal experience with such a situation. (*Id*. at 208:14-23, 208:24-209:16.) In any event, contributor agreements are entered into with Alamy Ltd.,

which acts on behalf of the contributors when issuing invoices for the authorized use of images from the Alamy platform. (Allsworth Decl. ¶¶ 28, 43-44.)

Additionally misleading to state that Ms. Serember had no idea how an Alamy Inc. employee would deposit a check sent to the office because in her time as Alamy Inc.'s general manager, such circumstances had never occurred. (Wolff 9/11 Decl., Ex. M at 212:6-24.) This form of payment was simply uncommon and therefore Ms. Serember, reasonably, was not aware of an official protocol for processing such payment form, though she surmised that the check could be passed along to Alamy finance staff. (*Id*. at 212:15-213:4.)

24.     Mr. Schilizzi was CFO / COO of Alamy Ltd. and Director of Alamy Images India when he testified in September 2019. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 4:16-23, 5:11-12, 5:21-6:10.

**Defendants' Response:** Undisputed that Mr. Schilizzi was, at the time of his September 2019 deposition, employed as Alamy Ltd.'s chief financial officer. Disputed that Mr. Schilizzi was, at this time, also employed as Alamy Ltd.'s chief operating officer, as he held that position from 2016 to the start of 2018, at which point, he transitioned to his chief financial officer role. (Wolff 9/11 Decl., Ex. J at 6:16-22.)

Undisputed that Mr. Schilizzi also testified that he was a director of Alamy Images India and received director's fees therefrom. (*Id*. at 4:22-23; *see also*, Ex. K at 6:2-5.)

25.     Although Mr. Schlizzi also described himself as Secretary of Alamy, Inc. (Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 25:13-18), Ms. Serember, the company's General Manager, was unaware that Mr. Schilizzi had any role with Alamy, Inc. Cowley Decl. Ex. 3, Serember Tr. 65:17-20.

**Defendants' Response:** Undisputed that Mr. Schilizzi was the secretary of Alamy Inc. at the time of his deposition. (Wolff 9/11 Decl., Ex. J at 33:4-11.) Although it is also undisputed that Ms. Serember was unaware of Mr. Schilizzi's role (Wolff 9/11 Decl., Ex. M at 65:17-20) as Mr. Schilizzi testified, his responsibilities with Alamy Inc. were minimal and pertained exclusively to specific financial functions, namely, filing tax returns with the U.S. government and signing corporate documents or contracts related to the company, such as the lease for the Brooklyn office, which would not have overlapped with or otherwise informed Ms. Serember's role as general manager. (Wolff 9/11 Decl., Ex. J at 33:12-35:6.)

26.     In his initial deposition, Mr. Schilizzi testified that Alamy, Inc. has no directors and its only officers are James West, President, and Mr. Schilizzi, Secretary. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 30:15-20; 30:21-31:1.

**Defendants' Response:** Undisputed that Mr. Schilizzi testified that Alamy Inc. had no directors but did have officers, James West, its president, and himself, its secretary. (Wolff 9/11 Decl., Ex. J at 39:19-40:9, 33:4-7.)

27.     Mr. Schilizzi identified the Alamy, Inc. bank account, and its only three signatories all are employees full time in the UK – Mr. West, Mr. Capel and Mr. Schilizzi. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 27:9-28:14.

**Defendants' Response:** Undisputed that Mr. Schilizzi identified the signatories for the Alamy Inc. bank account as James West, Alan Capel, and Mr. Schilizzi. (Ex Wolff 9/11 Decl., Ex. J 35:11-37:5.) Misleading to frame these figures only as full-time Alamy Ltd. employees when Mr. Schilizzi also served as Alamy Inc.'s secretary and Mr. West as its president. (*Id*. at 33:4-7, 40:3-9.) Disputed that Mr. West and Mr. Capel's employment or residential status was ever verified by Mr. Schilizzi as fully in the UK.

12

28.     Mr. Schilizzi testified in his first deposition that the inter-company loan between Alamy, Inc. and Alamy Ltd. was put in place following the advice received from a tax adviser representing both entities, expecting that the existence of a loan would permit deduction of interest payments and lower taxes paid in the United States. Mr. Schilizzi said he did not know how it would affect taxes paid in the United Kingdom. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 32:2-7, 33:12-37:1.

**Defendants' Response**: Undisputed that an inter-company loan between Alamy Inc. and Alamy Ltd. was put in place following the advice from a tax advisor for both organizations, expecting that a loan would be the most tax efficient measure of initially funding Alamy Inc. as it would allow deductible interest for tax purposes to both organizations. (Wolff 9/11 Decl., Ex. J at 41:15-18, 43:1-48:10.) The loan structure was, however, in the first instance, selected as a means of providing initial funding to Alamy Inc. upon its formation in the form of shares issued to Alamy Ltd. (*Id*. at 42:1-8.)

29.     Although he identified himself as the Secretary of the company, Mr. Schilizzi was not aware whether there is a signed version of Alamy, Inc. By Laws. He testified at that time that Alamy, Inc. had no shareholder meetings or actions in lieu of shareholder meetings. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 38:10-12; 39:13-17; 39:23-25.

**Defendants' Response**: Undisputed that in his capacity as Alamy Inc.'s Secretary, Mr. Schilizzi was not aware as to whether there was a signed copy of the Alamy Inc.'s bylaws, though he did recall establishing them when he helped originally set up the company and maintaining them thereafter. (Wolff 9/11 Decl., Ex. J at 48:12-49:1.) Disputed that Alamy Inc.'s shareholders never held shareholder meetings or took shareholder actions. (*Id*. at 49:17-51:19.) As Mr. Schilizzi testified, he was merely unaware of any formal shareholder meetings or whether meetings

pertaining to Alamy Inc. were formally documented as such, but that he did meet routinely with James West to discuss Alamy Inc. business, such as the inter-company loan. (*Id*. at 49:17-51:19.)

30.     Although he changed his testimony following a break to say that he recalled that he and Mr. West are Directors of Alamy, Inc., he did not know of any Board of Director meetings. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 40:14-43:2, 43:3-44:2.

**Defendants' Response:** Disputed. Misleading attempt to discredit Mr. Schilizzi's testimony when he neither changed his testimony nor was there a break at this time during his deposition. (Wolff 9/11 Decl., Ex. J at 52:1-57:15.) Rather, counsel for both parties had a brief discussion on the record about Alamy Inc.'s objections to Mr. Cowley's line of questions, particularly as he ignored Mr. Schilizzi's requested clarification as to the distinction between a director and officer of Alamy Inc. (*Id*. at 53:3-16.) As Mr. Schilizzi testified, there had been a language discrepancy between his initial understanding of the question about directors at Alamy Inc., owing to differences in the American and British understanding of the title "director" at a company, and he wished, upon realizing this, to clarify that as officers of Alamy Inc., himself and Mr. West would also be considered directors. (*Id*. at 54:11-22.) Mr. Cowley himself recognized the potential ambiguity in his phrasing of the question and sought to clarify it at the time (*Id*. at 55:9-19), at which point, Mr. Schilizzi again identified Alamy Inc.'s directors (*Id*. at 55:16-21). Also misleading as Mr. Schilizzi testified that he and Mr. West routinely held informal meetings pertaining to Alamy Inc. (*Id*. at 52:8-18.)

31.     Mr. Schilizzi testified that Alamy, Inc. had not appointed a Treasurer, although identified in the By Laws, but that he would informally act like one. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 44:22-50:11.

**Defendants' Response:** Disputed. Mr. Schilizzi testified at length that he served as Alamy Inc.'s treasurer in an informal capacity, looking after its finances, overseeing its payment of taxes, and maintaining corporate accounting books. (Wolff 9/11 Decl., Ex. J at 58:16-65:15.) Mr. Schilizzi never stated that Alamy Inc. had not appointed a Treasurer. (*Id*.)

32.     Mr. Schilizzi acknowledged that Alamy, Inc. does not have any officer that is not also an officer of Alamy Ltd. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 54:22-24.

**Defendants' Response:** Undisputed that, at the time of Mr. Schilizzi's deposition and as he testified, Alamy Inc.'s officers were also employed by Alamy Ltd. (Wolff 9/11 Decl., Ex. J at 70:13-71:6.) Disputed and misleading to the extent that Mr. Schilizzi clarified that Alamy Ltd. operated pursuant to a different corporate structure, whereby Alamy Ltd.'s officers occupied different positions and titles than "officer" with Alamy Ltd.: specifically, James West was an officer of Alamy Inc. but a director of Alamy Ltd., while Mr. Schilizzi was an officer of Alamy Inc. but the company secretary of Alamy Ltd. (*Id*. at 70:13-21.)

Additionally misleading, in that Mr. Schilizzi noted that there had previously, and recently, been an officer of Alamy Inc. who was also not employed with or an officer of Alamy Ltd. This was the previous incumbent head of sales for Alamy Inc., Adam Goldberg, who departed in 2019, prior to Ms. Serember assuming that position. (*Id*. at 66:18-68:2.) Mr. Goldberg was Alamy Inc.'s Vice President, an officer. (*Id.; see also* Wolff 9/11 Decl., Ex. M at 61:2-9.)

33.     Defendants' customers fall into two general categories: (1) managed accounts with whom sales representatives work; and (2) non-managed accounts who make purchases on alamy.com without working with a sales representative. The great majority of Alamy, Inc.'s revenue comes from purchases by managed accounts Cowley Decl. Ex. 3, Serember Tr. 74:10-76:10.

**Defendants' Response**: Undisputed that, as Ms. Serember testified, sales to clients fell into managed and non-managed categories, with managed sales accounting for roughly over 75 percent of Alamy Inc.'s revenue. (Wolff 9/11 Decl., Ex. M at 74:10-76:10.) Managed sales encompassed sales brought about by client interaction with Alamy Inc.'s sales team, while non-managed sales derived from visitors interacting with Alamy Inc.'s website. (*Id*. at 76:2-9.)

34.     All sales to customers located in the United States are attributed to Alamy, Inc. and payments go to Alamy, Inc.'s bank account, even if the Alamy, Inc. salespeople have no contact with the customer, or role in a purchase by a customer on the website using a credit card. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 59:9-60:12, 61:2-14; Cowley Decl. Ex. 3, Serember Tr. 57:14-59:15, 75:19-23, 76:13-77:23.

**Defendants' Response**: Undisputed that non-managed revenue, that is revenue deriving from a customer who engaged with alamy.com from within the U.S. but not with the Alamy Inc. sales team, would be credited to Alamy Inc. (Wolff 9/11 Decl., Ex. M at 57:14-59:15.) Alamy Inc.'s invoices were processed through the alamy.com website such that U.S. customers' purchases through the website were credited to Alamy Inc. (Wolff 9/11 Decl., Ex. J at 77:10-12, 79:19-80:12.)

35.     Alamy Ltd. and Alamy India employees handle directing all payments from the U.S. customers to Alamy, Inc. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 59:9-60:12; 74:22-75:13.

**Defendants' Response**: Undisputed that staff from Alamy India processed the invoices generated from Alamy Inc. and were responsible for accounts payable thereto, but misleading in that bills for Alamy Inc. were sent out directly through the alamy.com website. (Wolff 9/11 Decl., Ex. J at 77:10-78:17, 98:18-99:1.) Disputed that Alamy Ltd. handled Alamy Inc.'s customer payments, as Defendants' billing team was based in India; rather, Alamy Ltd. would track the

accounts receivable function. (*Id*. at 78:15-17.) Moreover, all Alamy Inc. sales accounts executives, as well as Ms. Serember, had full access to invoice statements for Alamy Inc. company-wide and were aware of what was being invoiced out. (*Id*. at 78:19-79:9.)

36.    Alamy Ltd. applies a sales distribution fee to the Alamy, Inc. bank account, taking out 97% of profits over the Alamy, Inc. office operating expenses. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 56:9-58:3; 58:10-14; 58:24-59:1; Cowley Decl. Ex. 16 (Rule 30(b)(6) Depo. Ex. 8). The Alamy, Inc. revenue calculations necessary to apply the sales distribution fees against its bank account are performed by Alamy Ltd. and Alamy India employees. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 59:9-60:12.

**Defendants' Response:** Disputed and misleading in that Mr. Schilizzi never testified that Alamy Ltd. took out 97 percent of Alamy Inc.'s profits, but rather that Alamy Inc.'s invoice owed to Alamy Ltd., termed an inter-company sales distribution fee, was calculated to leave a three percent profit in Alamy Inc., ensuring that Alamy Inc. always had a three percent operating profit at the end of each month. (Wolff 9/11 Decl., Ex. J at 72:19-74:3.) In reaching this operating profit, Mr. Schilizzi would deduct the costs of running Alamy Inc. from its revenue; then the sales distribution fee would be charged to ensure that the revenue less the cost and the fee would equal three percent of Alamy Inc.'s revenue for the month. (*Id*. at 75:1-18.)

Undisputed that Mr. Schilizzi, with Alamy Ltd., though also a director and acting treasurer of Alamy Inc., performed the sales distribution fee calculations. (*Id.* at 75:8-18, 54:11-22, 58:16-65:15.) Disputed that staff in India also performed this function; rather the India team would raise the final invoice and post it into the account books. (*Id*. at 75:14-76:17.)

37.    Ms. Serember, as General Manager of Alamy, Inc., has no access to the bank account activity necessary to monitor Alamy Ltd.'s application of sales distribution fees against

the sales money in Alamy, Inc.'s bank account. And even though Alamy Ltd.'s sales distribution fee reports state they are sent to Alamy, Inc.'s accounts payable group, she is unable to identify such a group. Cowley Decl. Ex. 3, Serember Tr. 128:12-129:17, Ex. 16 (Rule 30(b)(6) Depo. Ex. 8).

**Defendants' Response:** Disputed. Ms. Serember was not aware of Alamy Inc.'s access to information pertaining to sales distribution fees because it was outside the scope of her position as general manager for Alamy Inc. or whether there was an accounts payable group within Alamy Inc. (Wolff 9/11 Decl., Ex. M at 128:12-129:17.) Ms. Serember never stated that she did not have this access or that there was no such group.

38.    Although General Manager of Alamy, Inc. and leading a team focused on selling licenses to images on alamy.com to its customer base, Ms. Serember could not explain what license rights Alamy, Inc. provided to the customers based on "permission" by Alamy Ltd. and she had never seen any written explanation of that permission. Cowley Decl. Ex. 3, Serember Tr. 164:24-165:24; 1669-170:7; 170:25-171:19.

**Defendants' Response:** Disputed, misleading, and immaterial, as Ms. Serember explained that Alamy Ltd. negotiated and owned the licenses for contributors, rather than Alamy Inc. (Wolff 9/11 Decl., Ex. M 163:12-166:24), which in any event, were freely accessible on the alamy.com website's Terms and Conditions page and afforded Alamy Inc. permission to represent alamy.com in the market. (*Id*. at 166:9-18, 168:10-23.) Ms. Serember explained, numerous times, that her role with Alamy Inc. pertained to sales, rather than engaging with contributors, which was, rather, within Alamy Ltd.'s purview. (*Id.* at 11:12-20, 13:12-22, 45:10-21, 79:23-80:12.) Alamy Ltd. brokered license agreements with contributors for the images subsequently available to Alamy Inc. Clients. (Allsworth Decl. ¶ 28; Defendants' Local Rule 56.1 Statement of Undisputed Material

Facts ("Defendants' SUF") ¶ 33; *see also* Wolff 9/11 Decl. ¶ 5 at Ex. L at 292:11-293:8, 298:10-299:6.) Immaterial in that Ms. Serember's knowledge of licensing rights provided by Alamy Inc. based on Alamy Ltd.'s contributor agreements has no bearing upon the issues raised on summary judgment.

39.    Mr. Schilizzi, Alamy Ltd.'s corporate designee, characterized Alamy, Inc.'s right to sell licenses for images on alamy.com to customers as an informal agreement, and nothing was put in writing concerning that agreement as of his testimony in September 2019. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 85:3-86:10, 873-10.

**Defendants' Response:** Undisputed that Mr. Schilizzi noted that Alamy Inc.'s permission to issue licenses and charge for licenses pertaining to images on the alamy.com website was not governed by a written agreement but rather an informal agreement that as a sales office, it would have the right to sell said images as a subsidiary of the Alamy Ltd. holding company. (Wolff 9/11 Decl., Ex. J at 111:21-113:18.) Misleading to the extent that Plaintiff seeks to paint this agreement as *ad hoc* or not adequately deliberated upon, as this agreement was determined upon the formation of Alamy Inc. to enable it to sell license fees in the U.S. territory, by James West and Mr. Schilizzi, both officers for Alamy Inc., and Alamy Ltd.'s director and secretary, respectively. (*Id*. at 39:19-40:9, 70:13-21, 113:19-114:14.)

40.    When license invoices are paid by U.S. customers to Alamy, Inc., Alamy Ltd. pays a portion of the revenue to contributors, but it does not track the amount of contributor fees paid attributable to U.S. customer payments, or use such calculation when determining the amount to take in sales distribution fees from Alamy, Inc.'s bank account. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 107:16-24, 109:18-22, 110:5-25.

**<u>Defendants' Response</u>**: Undisputed that when invoices for licensed images are issued payable to Alamy Inc., Alamy Ltd. pays a portion of the license revenue to contributors and does not regularly track the percentage of sales distribution fees received from Alamy Inc. paid out as contribution fees. (Wolff 9/11 Decl., Ex. J at 143:1-14, 145:18-23.) Misleading, however, to state that Alamy Ltd. does not track the source of U.S. customer payments, as Mr. Schilizzi noted in his testimony that Alamy Ltd. uses money from the sales distribution fee from Alamy Inc. to pay contributors, through Alamy Ltd.'s U.S. dollar account at Barclays, which receives funds from Alamy Ltd. and Alamy Inc. customers in U.S. dollars. (*Id.* at 143:11-145:11.) Mr. Schilizzi confirmed that Alamy Ltd., which paid contributors their owed license revenue for Alamy Inc., invoiced sales through an automated process in line with the contributor contract, from the Alamy Ltd. bank account, but did not hypothecate incoming revenue. (*Id.* at 143:1-144:5.)

Moreover, Mr. Schilizzi, as Alamy Ltd.'s finance director and company secretary and Alamy Inc.'s secretary, treasurer, and director, oversees the revenue charged by Alamy Inc. as measured against the costs and contributor commissions. (*Id.* at 146:1-147:6). And, as reiterated throughout Mr. Schilizzi's testimony, Alamy Ltd. routinely ensures that a three percent profit remains in Alamy Inc. (*Id.* at 146:1-14.)

41.    Alamy Ltd. does not track how much it costs to provide HR, IT billing and invoicing functions for Alamy, Inc. and it does not calculate whether the amount it takes in sales distribution fees earns a profit on the costs it incurs to operate Alamy, Inc., it simply targets leaving 3% of the office operating profit in the account to pay US taxes. (Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 129:16-138:9.)

**<u>Defendants' Response</u>**: Undisputed that Alamy Ltd. provided some limited HR support for Alamy Inc. where otherwise not beneficial to have a local employee on the ground, as well as

some minor IT support. (Wolff 9/11 Decl., Ex. J at 148:11-149:11.) (For clarification, the deposition transcript citations provided by Plaintiff for this statement were not included in the version of Mr. Schilizzi's transcript attached to Mr. Cowley's Declaration, which ends on page 126; however, the discussion of HR and IT costs within Plaintiff's version of the transcript that correspond to Defendants' appears throughout Cowley Decl. Ex. 4, Schilizzi Vol. 1 at 110:10-113:24, though Plaintiff has not included all relevant pages.) Misleading because although Alamy Ltd. does not formally track the costs of these functions, as Mr. Schilizzi explained regarding its IT services in particular, this approach stemmed from the fact that said costs were so small and insignificant. (*Id.* at 149:1-4, 149:13-16.) Generally, Alamy Ltd. does not track through individual line-item costs every service Alamy Ltd. may provide for Alamy Inc. (*Id.* at 146:15-148:9.)

Undisputed that Alamy Ltd. generally provides billing and invoicing services on Alamy Inc.'s behalf. (*Id.* at 149:17-20.) Disputed that the sales distribution fee simply targets leaving three percent of gross sales revenues profit in Alamy Inc. It is used to pay the Alamy Inc. tax bill, though there's often an annual dividend of approximately $200,000. (*Id.* at 151:18-152:10.)

42.    Mr. Schilizzi was not aware of any study being conducted to determine the actual cost of services Alamy Ltd.'s provides to Alamy, Inc. compared to the market cost of such services generally, or compared to the amount Alamy Ltd. takes from the Alamy, Inc. bank account for distribution service fees. Schilizzi Vol. 2 at 61:22-62:10; 78:9-79:18; 81:24-84:11.

**Defendants' Response:** Disputed and immaterial. Alamy Ltd. had determined a figure for the distribution service fee compliant with U.S. and U.K. taxes in accordance with standards applicable to a transfer pricing agreement. (Wolff 9/11 Decl., Ex. K at 134:12-135:18.) (For clarification, the deposition transcript citations provided by Plaintiff for this statement pertain to testimony regarding a professional indemnity schedule and insurance coverage for Alamy Ltd.,

not a discussion of whether a study had been conducted to determine the cost of services provided by Alamy Ltd. to Alamy Inc.) Misleading in that Mr. Schilizzi did not testify that he was not aware of any study conducted to determine the cost of services Alamy Ltd. provided to Alamy Inc., but rather that the rate for the fee had been set in 2009 per a transfer pricing study and that a subsequent study had not been commissioned. (*Id.* at 135:20-136:21.) Additionally, Alamy Ltd. tracked the cost of the contributor portion of services provided. (*Id.* at 136:23-137:2.) Charges for service costs to Alamy Inc. corresponded to services rendered, such as website hosting and support for the Alamy website used by Alamy Inc., included as part of the sales distribution fee. (*Id.* at 141:13-143:18, 145:11-20.)

43.    The sales distribution fees Alamy Ltd. has taken from Alamy, Inc.'s bank account amount to many millions of dollars each year for which it produced data in this case, reaching over $6 million for the month of October 2019 alone. Cowley Decl. Exs. 16 (Rule 30(b)(6) Depo. Ex. 8) and 47(ALA003899, September 30, 2019 Distribution Fee statement).

**Defendants' Response:** Undisputed that from 2016 through 2019, the years for which Plaintiff has provided monthly sales distribution fee statements, Alamy Ltd. received an aggregate yearly fee from Alamy Inc., amounting in the millions of U.S. dollars. Disputed that the sales distribution fee for October 2019 reached over $6 million alone, as Plaintiff has failed to attach a fee from this month. Plaintiff may erroneously be referring to the September 2019 fee, which totaled $644,708.58, in keeping with the typical range of monthly fees from this time, but which contains an additional misplaced comma so that on the invoice the figure reads "$6,44,708.58." (Cowley Decl. Ex. 47 (ALA003899, September 30, 2019 Distribution Fee statement).) No single fee from this time period has in fact exceeded one million U.S. dollars. Misleading in that these fees pertain to the invoice Alamy Inc. owes Alamy Ltd. monthly, which reflects deductions for the

cost of running Alamy Inc. but ensures three percent profit is left each month in Alamy Inc. (Wolff 9/11 Decl., Ex. J at 73:3-9, 75:1-7.)

44.    Revenue attributed to Alamy, Inc. in the first instance makes up approximately 40% of the total revenue for all the Alamy entities. Alamy Ltd. considers itself to be running an international business, and the U.S. market is its biggest market. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 113:8-11; Cowley Decl. Ex. 7, Schilizzi Vol. 2 at 189:17-192:19.

**Defendants' Response:** Undisputed that as Mr. Schilizzi testified, the revenue of Alamy Group companies attributable to sales and licenses paid to Alamy Inc. is generally about 40 percent (Wolff 9/11 Decl., Ex. J at 150:11-15); however, as Mr. Schilizzi also advised, the U.S. revenue taken as a sales distribution fee from Alamy Inc. to Alamy Ltd. usually consists of 33 to 35 or 36 percent of company turnover.  (Wolff 9/11 Decl., Ex. K at 189:17-191:24.) Undisputed that Mr. Schilizzi considers Alamy Ltd. to be an international business, with the U.S. its biggest market. (*Id*. at 192:8-19.)

45.    On its UK tax returns, Alamy Ltd. treats the money it takes from Alamy, Inc.'s bank account as distribution service fees as rolled into the general "turnover" attributable to sales of licenses in the content on alamy.com; Alamy Ltd. does not treat those revenues as arising out of sales or other charges for the provision of services. Cowley Decl. Ex. 4, Schilizzi Vol. 2 at 183:24-189:15; Cowley Decl. Exs. 30-31 (Rule 30 (b)(6) Depo Exs. 26-27).

**Defendants' Response:** Undisputed that on its UK tax returns, Alamy Ltd. includes the Alamy Inc. sales distribution fee within a turnover figure that equates to revenue. (Wolff 9/11 Decl., Ex. K at 185:14-188:22.) Misleading to the extent that this turnover figure is otherwise comprised of Alamy Ltd.'s direct sales figures, including all of Alamy Ltd.'s sales throughout the

UK, Europe, Africa, South America, and everywhere apart from the territories—the United States, India, and Australia—where it has a subsidiary. (*Id.* at 184:18-21, 188:23-189:5.)

46.    Even though Alamy Ltd.'s insurance policy in place at the time this lawsuit commenced expressly covered Alamy Ltd. only, with no mention of any subsidiary of affiliate being a covered insured, Alamy Ltd. takes the position that the Complaint naming only Alamy, Inc. was a covered claim. Cowley Decl. Ex. 4, Schlizzi Vol. 1 at 119:12-15; 121:11-16; 122:3-8; Cowley Decl. Ex. 7, Schilizzi Vol. 2 at 61:22-62:10; 78:9-79:18; 81:24-84:11; 284:2-287:8; Cowley Decl. Ex. 33 (Rule 30(b)(6) Depo. Ex. 22C).

**Defendants' Response**: Disputed to the extent that Plaintiff implies the Alamy Ltd. insurance policy does not legally cover Alamy Inc. Undisputed that, as Mr. Schilizzi testified, the policy does cover the whole Alamy group of companies, including Alamy Inc., (Wolff 9/11 Decl., Ex. J at 158:3-23, 160:16-161:13; Ex. K at 61:22-62:10, 79:16-80:1), and that Alamy Ltd.'s insurance broker never raised issues with them about the policy applying to Alamy Inc. or this action brought by Plaintiff against it. (*Id.* at 78:9-79:11.) Mr. Schilizzi testified that he indeed received direct confirmation in a previous conversation with Alamy Ltd.'s insurance broker that the policy extended to all group companies. (*Id.* at 79:22-80:25.) Pursuant to industry standard, Alamy Ltd. as the holding company was the only entity listed on the insurance policy, with the understanding that its inclusion covered all of its subsidiaries. (*Id.* at 81:4-11.)

Also disputed to the extent that Plaintiff implies that the inclusion of Alamy Inc. as a covered subsidiary within the insurance policy can be interpreted as conflating the separate entities of Alamy Ltd. and Alamy Inc. as the same company. (*Id.* at 84:12-20.)

47.    The application for that insurance policy identifies only "Alamy" as the insured, listing three addresses for that entity, including the address of Alamy, Inc. in New York. Schilizzi Vol. 2 at 288:1-290:20; Cowley Decl. Ex. 34 (Rule 30(b)(6) Depo. Ex. 22D).

**Defendants' Response:** Disputed that the insurance policy identifies only "Alamy," and by Plaintiff's implication, Alamy Ltd., as the insured, considering that the policy did not in fact state "Alamy Ltd." as the firm name, nor any of the other Alamy subsidiaries, including "Alamy Inc." or "Alamy Australia." (Wolff 9/11 Decl., Ex. L at 288:1-290:20.) "Alamy" was listed on the policy to represent the Alamy Group—meaning Alamy Ltd. and its subsidiaries and/or any future holding company—and to provide coverage thereto. (*Id.* at 289:18-290:1; 293:24-294:6; *see also* Allsworth Decl. ¶ 28, Ex. N (citing ALA000022-ALA000045)) As testified to by Mr. Schilizzi, the numerous addresses listed on the policy, including in the U.K., U.S., and Australia, signified to the insurer, particularly through its past experience providing coverage to the Alamy Group and other documentation, that coverage would extend, under the policy, to Alamy Ltd. and its subsidiaries, including Alamy Inc. (*Id.* at 290:14-20.) Misleading to the extent that Plaintiff implies that the policy's reference to "Alamy" conflated all separate Alamy Ltd. subsidiaries—including Alamy Inc.—as one company.

48.    Alamy Ltd. was in operation for years before Alamy, Inc. was founded, and how Alamy Ltd. conduct of transactions with U.S. customers through the operations of alamy.com did not change based on Alamy, Inc. being opened. Schilizzi Vol. 2 at 126:19-127:25.

**Defendants' Response:** Undisputed that Alamy Ltd. was founded prior to Alamy Inc., which was incorporated in September 2008. (Wolff 9/11 Decl., Ex. K at 126:19-22.) Disputed that transactions with U.S. customers did not change upon the founding of Alamy Inc. While Mr. Schilizzi testified that *the website* that customers could visit to view and download images and

make payments by credit card did not change with the advent of Alamy Inc., (*Id.* at 126:23-127:25), its founding did allow for a dedicated sales team to service U.S. customers, as well as to, for instance, save them from incurring international credit charges had they had to make payments through Alamy Ltd. (*Id.* at 128:2-16; Wolff 9/11 Decl., Ex. M at 13:12-18; *see also* Allsworth Decl. ¶¶ 8, 10, 42)

49.     After Mr. Schilizzi's original testimony in September 2019, Alamy Ltd. created a document it titled an Inter-Company Services Agreement and back-dated the effect date of the new document to the founding of the company. Cowley Decl. Ex. 7, Schilizzi Vol. 2 at 220:25- 222:18; 223:4-12; 226:10-227:20; 229:8-231:22; 232:8-237:17; 238:12-244:14; 253:15-256:25; 258:4-259:23; 261:5-263:25; 264:9-20; 267:23-268:11.

**Defendants' Response:** Disputed that the Distribution Service Agreement, or Inter-Company Services Agreement, was created after Mr. Schilizzi's deposition in September 2019. As Mr. Schilizzi testified, the agreement was drafted sometime in late 2019, between July and October, and signed October 25, 2019. (Wolff 9/11 Decl., Ex. K at 220:18-221:2, 227:9-20.) As Mr. Schilizzi stated, it took approximately two months or so to discuss all the terms in the agreement, as well as to draft it, which would date the beginning of the process to August 2019 at least. (*Id.* at 228:17-229:4.) However, as Mr. Schilizzi noted, discussions surrounding the agreement had begun in June 2019, based on previous discussions between himself and James West on what intercompany service charges should be. (*Id.* at 230:8-231:2, 233:3-8.) The agreement was drafted because of a prospective company sale, wherein Alamy Ltd. sought to ensure all formal documents were in place, particularly considering third party, PA Media Group had requested the document as part of its due diligence process. (*Id.* at 229:22-230:6, 231:15-

232:6, 232:8-15, 233:22-234:4, 234:19-25.) The agreement served as a review of the documents Alamy Ltd. had and making sure they were up to date. (*Id.* at 230:8-15.)

Undisputed that the agreement was signed in October 2019 with an effective date of November 1, 2008, on advice of counsel. (*Id.* at 237:2-8.)

50.     Although one of its signers, Mr. Schilizzi could not explain why the new document had to be created, saying it was effective years prior, or why it referenced a shareholder vote of one of the companies being a requirement, when the company had no shareholders to vote. Cowley Decl. Ex. 7, Schilizzi Vol. 2 at 220:25-222:18; 223:4-12; 226:10-227:20; 229:8-231:22; 232:8-237:17; 238:12-244:14; 253:15-256:25; 258:4-259:23; 261:5-263:25; 264:9-20; 267:23-268:11.

**Defendants' Response:** Disputed. As Mr. Schilizzi explained, the document was created as a part of Alamy Ltd.'s due diligence process during the course of a prospective company sale, as well as per the request of third-party, PA Media Group, in regards to the sale. (Wolff 9/11 Decl., Ex. K at 229:22-230:6, 232:4-6, 232:8-15, 233:22-234:4. 234:19-25.) Moreover, Mr. Schilizzi testified that while this document was not one Alamy Ltd. was formally required to draft to effectuate the sale, however, it provided utility in encompassing a review of all the documents Alamy Ltd. had and ensuring they were up to date, as well as ensuring that a paper copy existed as a record of previous discussions between Mr. Schilizzi and James West regarding intercompany service charges. (*Id.* at 230:8-16, 230:17-231:2, 231:25-232:6.)

The shareholder approval reference within the agreement was included to cover various possible ownership scenarios, and in this case, pertained specifically to a context where the holding company was not a fully owned subsidiary, stating that in such case, the agreement would be subject to the company's shareholder's approval. (*Id.* at 241:10-242:1.) Plaintiff apparently seeks to conflate such standard contractual language, providing a means for the agreement's approval in

multiple ownership scenarios, with an implication on Alamy Inc.'s ownership structure, although as Mr. Schilizzi testified, Alamy Ltd. was the holding company of Alamy Inc., the fully owned subsidiary. (*Id.* at 242:2-10, 242:12-243:6, 246:1-25.) Mr. Schilizzi never stated that Alamy Inc. was not a fully owned subsidiary, nor did the agreement state or imply the same merely for containing conditional and standard verbiage regarding various possible ownership scenarios. (*Id.* at 243:19-24.)

51.      Although one of its signers, Mr. Schilizzi could not explain why the new referenced payments to be made by Alamy, Inc. to Alamy Ltd. for a variety of services, when none of those services were tracked to determine whether the costs related to the actual amounts Alamy Ltd. took from Alamy, Inc.'s bank account calling them sales distribution fees. Cowley Decl. Ex. 7, Schilizzi Vol. 2 at 220:25-222:18;  223:4-12;  226:10-227:20;  229:8-231:22;  232:8- 237:17; 238:12-244:14; 253:15-256:25; 258:4-259:23; 261:5-263:25; 264:9-20; 267:23-268:11.

**Defendants' Response:** Disputed. Mr. Schilizzi testified that the sales distribution fee referenced within the agreement pertained to costs associated with the contributor cost of sales— including the contributor commission fees—the cost for providing the alamy.com website and related support, HR costs, and finance and billing costs, while maintaining a three percent profit in Alamy Inc. (Wolff 9/11 Decl., Ex. K at 253:15-254:13, 258:4-13, 263:17-23.) As Mr. Schilizzi testified, pursuant to tax advice from Alamy Ltd.'s accountants, the sales distribution fees would not be included in the percentage of profits delivered into the intercompany service agreement. (*Id.* at 254:19-23.) Costs of services were tracked through invoices produced and sent to Alamy Inc. and were otherwise maintained by Alamy Ltd. through books and records pertaining to the fees, including website support and hosting, as well as billing and finance charges, and other associated charges. (*Id.* at 268:21-270:6, 272:3-11, 273:10-16.)

52. Since its founding, Alamy has changed its decision whether to apply Alamy watermarks to the copies it creates of the images uploaded to alamy.com, alternatively adding watermarks, ceasing the application of watermarks, then returning to a decision to add watermarks. *See* Cowley Decl. Exs. 48–50.

**<u>Defendants' Response</u>:** Undisputed that for a time in the early to mid-2000s Alamy Ltd. tested not including watermarks on its contributors' images for registered customers, while maintaining watermarks on images for unregistered users of the website. (Cowley Decl. Exs. 48-49.) Irrelevant and misleading in that this approach coincided with the advent of the Internet and the availability of archival photo collections online, which notably, in 2001 through 2005, generally predated widespread adoption of industry standards such as watermarking to prevent online infringement. Accordingly, Alamy Ltd.'s approach to watermarking photographs evolved over time as the company tested out methods of ensuring a more seamless purchasing process, whereby registered customers would be shown a clean image from the outset. (*Id.* at Ex. 49.) Of course, Alamy Ltd. sought to balance this trial practice with maintaining safeguards for contributors, including against infringement, including retaining a "slug" across the bottom of an image while actively monitoring the effectiveness of such practices. (*Id.* at Exs. 48-50.) At other times, Alamy Ltd. also employed digital encryption, which would retain information regarding the source of an image via an Alamy tag. (*Id.* at Ex. 49.) Alamy Ltd. also used digital encryption to protect larger preview images visible to registered viewers without watermarks, which would note the source of such images with an Alamy tag. (*Id.*) Alamy Ltd.'s interest in offering unwatermarked images at this time pertained to facilitating the layout design process, whereby certain customers could download a low-resolution comp without visual interference for layout

purposes, with the ultimatum of encouraging clients to ultimately purchase those images via Alamy Ltd.'s website, alamy.com. (*Id.*)

By 2007, however, Alamy Ltd. adopted a watermarking policy for all images on its website available to unregistered visitors and customers paying by credit card without an account, to reflect growing industry practice and consensus about the use of watermarks on preview imagery. (*Id.* at Ex. 50.) Reflective of its own experience by that time, Alamy Ltd. believed that its new policy would help deter any potential image scraping and infringement, particularly as the result of increased website traffic. (*Id.*)

53.    The focus of the internal discussion, and discussion with the contributors from whom Defendants' obtain images to populate alamy.com, concerning whether to add watermarks centered on the concern that Defendants' "low resolution" copies that were provided without license – called "comps" by the Defendants – and lifted copies from the website were of increasingly useful quality that was good enough for many users. So, they may not pay a license fee for higher resolution images. *See id.*

**Defendants' Response:** Disputed and misleading, as early 2000s discussions surrounding the use of watermarks—again, during a time of fluctuating and emerging industry-specific standards for combatting infringement via this practice—centered around ensuring a more seamless viewing process for customers. (Cowley Decl. Exs. 48-50.) Specifically, Alamy Ltd. intended to provide low resolution "comp" images without watermarks for customers' layout purposes, so that potential customers could determine how an image would suit their layout without visual interference prior to purchase. (*Id.* at Ex. 49.) Alamy Ltd. was clear that it did not intend to allow customers or visitors to the Alamy website to avoid paying a license fee or to use its images for free, which would have, in any event, been fundamentally detrimental to Alamy

Ltd.'s business and sales. (*Id.*) Moreover, as Alamy Ltd. discussed throughout these internal communications, in testing the removal of the watermarks, it specifically implemented numerous other safeguards, such as digital encryption, to deter infringement. (*Id.*) As it became clear to Alamy Ltd., however, that this approach enabled visitors to gain unauthorized access to low resolution images without watermarks for use beyond mere layout integration, it changed its policy to apply watermarks to all images that would be viewed by customers without accounts, including general visitors to the Alamy website. (*Id.* at 50.)

Additionally irrelevant as Plaintiff's images at issue in this action were uploaded to Defendants' platform years after Alamy Ltd. adopted its current watermarking practice. (*See* Plaintiff's Amended Complaint ("Am. Compl.") [ECF No. 58] ¶¶ 31-32.)

54.    One contributor whose input on the issue was considered by Defendants referenced that watermarks were important to address users who might keep and use the Defendants' low resolution comp versions without remember who owned the copyrights in the images. *See* Cowley Decl. Ex. 49 at pp. 2-3.

**Defendants' Response**: Undisputed that an Alamy Ltd. contributor expressed a concern that not including watermarks on images available to registered users of the Alamy website could result in users saving the "comp" images but subsequently forgetting the source. (Cowley Decl. Ex. 49.) Misleading, however, as an Alamy Ltd. representative explained to the contributor that Alamy Ltd. continued to include the source of the image on the image via a digitally encrypted Alamy tag, for which the contributor subsequently acknowledged his understanding and appreciation. (*Id.*)

Fundamentally irrelevant, for as stated immediately above, this referenced conversation occurred in 2001, years before Plaintiff's images at issue in this action were uploaded to the Alamy

website, at which time Alamy Ltd. had long adopted its current watermarking practice, whereby all images on the Alamy website viewable by visitors without accounts are watermarked. (*See* Amended Cmplt. [ECF No. 58] ¶¶ 31-32.) In fact, Plaintiff uses Alamy Ltd.'s longstanding watermarking practice as the basis for its copyright management information ("CMI") claim. (*See id.* at ¶ 44.)

55.    Defendants have actively enforced copyrights in images taken from the alamy.com website that were not paid for, both independently, and through the engagement of a copyright enforcement firm. *See* Cowley Decl. Ex. 8, Schilizzi Vol. 3 at 515:10-517:3; Cowley Decl. Exs. 23–24 (Rule 30(b)(6) Depo Exs. 15-16). In order for that firm to enforce Defendants' claimed copyright interests in the images on the alamy.com website, Defendants transferred full copies of all those images so the enforcement firm could run reverse image searches. *See* Cowley Decl. Ex. 8, Schilizzi Vol. 3 at 390:7-393:12.

**Defendants' Response:** Disputed to the extent that Plaintiff implies that Alamy Ltd. has, or is obligated to implement or abide by, an active policy to police infringement on its website. (Wolff 9/11 Decl., Ex. L at 515:10-517:3; Cowley Decl. Exs. 23-24.) Alamy Ltd. lacks the formal technology to search other websites for Alamy content. (Wolff 9/11 Decl., Ex. L at 372:11-17.) Disputed to the extent that Mr. Schilizzi testified that Defendants never supplied PicScout with any of the Images at issue. (*Id.* at 392:11-393:3.)

Undisputed, however, that on occasion, contributors would alert Alamy Ltd. to the presence of images online taken from the Alamy website without payment and that in such instances Alamy Ltd. would attempt to contact the infringers to seek a license and payment for this use. (*Id.* at 372:18-373:5, 515:10-22; *see also* Cowley Decl. Exs. 23-24.) Additionally, for a period of between 12 to 18 months, Alamy Ltd. used an image search company, PicScout, to identify

instances of infringement. (Wolff 9/11 Decl., Ex. L at 372:18-374:5.) However, as Mr. Schilizzi testified, using a third-party company like PicScout or otherwise employing image recognition software was not part of Alamy Ltd.'s business model. (*Id.* at 374:13-19.) Nor, to be clear, was Alamy Ltd. under any legal obligation to employ such software or actively police its website for infringement.

Undisputed that during its period of engagement with PicScout, Alamy Ltd. physically transferred images to PicScout in order to assist in identifying infringement. (*Id.* at 390:7-10.) Such images, pursuant to Alamy Ltd.'s contract with PicScout were likely deleted from PicScout's image database after the contract ended, however. (*Id.* at 391:13-22.)

56.     After Plaintiff filed its Complaint, but before then sole-Defendant Alamy, Inc. filed a motion to dismiss, Defendants' changed the License Agreement held out to U.S. customers as the required terms for obtaining a license of any image on alamy.com. Cowley Decl. Exs. 22-23 (Rule 30(b)(6) Depo. Exs. 12-13); Memorandum and Order dated January 21, 2022 (J. Chen) (ECF No. 126) at pp. 1-5.

**Defendants' Response:** Undisputed that the license agreement available on alamy.com— referred to throughout this action as the May 2018 License Agreement—was updated in September 2018 (the "September 2018 License Agreement") and included reference to Alamy Ltd. Memorandum and Order dated January 21, 2022 (J. Chen) (ECF No. 126) at 2. Disputed in that, apart from the inclusion of Alamy Ltd., the updated agreement did not fundamentally change the terms for U.S. customers to obtain a license for images on alamy.com. (Plaintiff's Letter Motion to Compel [ECF No. 68], Exs. 3-4.) Irrelevant as Defendants have long been aware of and in possession of both versions of the license agreement, considering that the May 2018 License Agreement was live on alamy.com when Plaintiff filed its complaint on June 4, 2018, (Defendants'

Objections to Magistrate Judge James Orenstein's October 1, 2020 Order ("Defendants' Objections") [ECF No. 104] at 2), which Plaintiff annexed as a full copy to its opposition to Alamy Inc.'s motion to dismiss, (ECF No. 30, Ex. 3), and Defendants produced the September 2018 License Agreement on May 14, 2019. (Defendants' Objections [ECF No. 104] at 7).

57.    Defendants' held the new version, with its new language lining up with the arguments made by Defendants concerning an alleged passive, but permitted (by Alamy Ltd., not contributors) role for Alamy, Inc. as if it were the License Agreement posted to the alamy.com website during the relevant time period, leading to a dispute concerning the applicability of attorney-client privilege to the communications surrounding that change of language. Memorandum and Order dated January 21, 2022 (J. Chen) (ECF No. 126) at pp. 1-5.

**Defendants' Response:** Disputed that Defendants held up or intentionally misrepresented the September 2018 License Agreement as the version originally posted on alamy.com at the time of Plaintiff's filing of the complaint, as thoroughly outlined by Defendants in a timeline pertaining to the dispute over this matter. (Defendants' Objections [ECF No. 104] at 3-6.) Irrelevant in that the dispute over the license agreements versions has long been resolved, and Plaintiff has been in possession of both versions for years. *Id.*

58.    Defendants' argued that the change was innocent, and not intended to influence the motion to dismiss arguments. The real purpose of the change as described in an email from Defendants' outside counsel in the UK was: "The amendment of the contract to the correct intragroup contractual position will assist with the wrong defendant claim as they place a large amount of emphasis on the erroneous US EULA terms and conditions." Cowley Decl. Ex. 56 (ALA 002754-2757). The "wrong defendant" argument described Defendants' position that

Alamy, Inc. cannot be sued at all, and Alamy Ltd. cannot be sued in the U.S., as set forth in the motion to dismiss the original Complaint.

**Defendants' Response**: Disputed that in updating the May 2018 License Agreement, Defendants intended to convince the Court that the earlier version did not exist in an effort to succeed in a jurisdictional argument on its motion to dismiss. (Cowley Decl. Ex. 56 (ALA002755); Defendants' Objections [ECF No. 104] at 5-6.) As Defendants have previously advised, the discussion about updating the May 2018 License Agreement conceived of its "correct[ion] to the intra-group contractual position" as assisting "with the wrong defendant claim" insofar as Alamy Ltd. could inform the Court that the updated version reflected the actual commercial and corporate reality of Alamy Ltd. and Alamy Inc. and that Plaintiff's avowed characterization was incorrect. (Defendants' Objections [ECF No. 104] at 5-6.) Defendants never, however, misrepresented that the ultimate September 2018 License Agreement was the only version that had existed throughout the pendency of the case, and in fact took pains to preserve the original—which was in any event, already in Plaintiff's possession and had been accessible on the Alamy website when Plaintiff filed its Complaint—for discovery purposes. (*Id.* at 3-7 (citing ALA002761).) Irrelevant in that the dispute over the license agreements versions has long been resolved, and Plaintiff has been in possession of both versions—as well as aware of Defendants' intent in updating the agreement—for years. (*Id.*)

59.    The actual License Agreement that was on alamy.com for U.S. customers to review and accept when acquiring an image prior to Plaintiff filing its Complaint stated that Alamy, Inc. "has been appointed agent by written agreement with its Contributors to grant this License on their behalf." Cowley Decl. Ex. 21 (Rule 30(b)(6) Depo. Exs. 13).

**Defendants' Response**: Undisputed that the license agreement available on alamy.com immediately prior to and at the time Plaintiff filed its Complaint—specifically, the May 2018 License Agreement—stated that "Alamy [meaning Alamy Inc.] has been appointed agent by written agreement with its Contributors to grant this License on their behalf." (Plaintiff's Letter Motion to Compel [ECF No. 68], Ex. 4.)

60.    Rather than erroneously describe Defendants' agreements with its contributors, the pre-Complaint License Agreement accurately described the terms of at least the form Contributor Agreement that went into use sometime in 2014 for some period of time. *See* Cowley Decl. Ex. 8, Schilizzi Vol. 3 at 292:16-299:14; Cowley Decl. Ex. 30 (Rule 30(b)(6) Depo. Ex. 31).

**Defendants' Response**: Disputed and misleading. The previous Alamy Ltd. Contributor Contract displayed on the Alamy website likely in 2014, (Wolff 9/11 Decl., Ex. L at 292:16-24), stated that contributors to the Alamy website appointed the Alamy Group—consisting at the time of Alamy Ltd., Alamy Inc., and Alamy Images India, (*Id.* at 294:17-295:6)—to license their images. (*Id.* at 295:21-297:10, Cowley Decl. Ex. 30 (Rule 30(b)(6) Depo. Ex. 31)). In contrast, the May 2018 License Agreement—in place immediately before and at the time Plaintiff filed its Complaint—stated that Alamy Inc. could exploit, i.e., license, contributors' images. (Wolff 9/11 Decl., Ex. L at 298:11-299:6; Plaintiff's Letter Motion to Compel [ECF No. 68], Ex. 4.)

61.    Defendants' cannot identify what contributors reviewed and agreed to those terms, if any, and they cannot specify when terms to the form changed based on the information they produced. *See* Cowley Decl. Ex. 4, Schilizzi Vol. 1 at 90:23-91:9 (Alamy does not keep records of whether a contributor expressly agrees to Defendants' posted contributor contract, and cannot say it maintains records whether a contributor even views it); Cowley Decl. Ex. 8, Schilizzi Vol. 3 at 304:24-313:18; 375:10-377:11, 377:12-378:1, 380:13-387:16, 393:24-397:9 (Defendants'

Rule 30(b)(6) designee could not identify the dates any form contributor agreement went into effect based on the information provided by Defendants concerning the numerous versions of a form agreement; it would take layers of investigation into technical information on the system that he cannot do himself).

**Defendants' Response:** Undisputed that Alamy Ltd. does not maintain records identifying whether contributors expressly agreed to the terms and conditions of a contributor contract. (Wolff 9/11 Decl., Ex. J at 119:21-120:1.) Misleading, however, in that Mr. Schilizzi testified that Alamy Ltd. records the dates a contributor registers with their organization, which provides the contributor contract they signed, and, as part of the process, requests contributors to check a box agreeing to Alamy Ltd.'s terms and conditions. (*Id.* at 120:2-11.) Additionally misleading in that Mr. Schilizzi testified as to a record of numerous changes made throughout the history of Alamy Ltd.'s Contributor Agreement, including recollecting dates that the changes went into effect. (Wolff 9/11 Decl., Ex. L at 304:24-309:15.) Moreover, Alamy Ltd. maintained records of the various iterations of the Contributor Agreement. (*Id.* at 308:25-309:15.)

62.    There are 24 photographic images owned by the Plaintiff, each registered with the Copyright Office, that are subject to Plaintiff's infringement claims ("Copyrighted Works"), and all but one of which are subject to Plaintiff's DMCA violation claim. Grecco Decl. ¶ 23-24, Ex. 2.

**Defendants' Response:** Disputed. Plaintiff *claims* that he validly registered the 24 images with the U.S. Copyright Office, however, the images at issue are comprised of publicity stills of actors from television shows from the 1990s, for which discovery revealed that Plaintiff may not be the copyright owner. (Defendants' SUF ¶¶ 13, 75, 77; Am. Compl. [ECF No. 58], ¶ 40 and Ex. B.) On some of the images' original slide mounts, which Defendants' contributors provided them after commencement of this action, there is a copyright credit to the television networks and studios

who commissioned the handout. (Defendants' SUF ¶ 78.) Moreover, Plaintiff never filed the list of images compiled as Exhibit 2 to Mr. Grecco's Declaration to the docket in this case and is therefore precluded from relying on it at present. (Am. Cmpl. [ECF No. 58] at Ex. A.)

63.    Six of those images Defendants had received from SuperStock at a time when Plaintiff agreed to license various images to SuperStock. Grecco Decl. ¶ 25, Ex. 3.

**Defendants' Response:** Disputed. Alamy Ltd. had a distribution agreement with Superstock, but as to Plaintiff's images, such agreement only related to the uploading of three images to the Alamy website for license, "19780101 Bob Marley MGP 0009," "19970506_sorbo_kevin_Hercules_MGP_00,"                          and "19970506_sorbo_kevin_Hercules_MGP_00" as depicted in the Declaration of Michael Grecco, Exhibit 3. (Allsworth Decl. ¶ 94.) Undisputed that the images were uploaded to the Alamy website during the period in which Plaintiff's SuperStock Agreement was in effect. (*Id.* at ¶ 99.) Moreover, Plaintiff never filed the list of images compiled as Exhibit 2 to Mr. Grecco's Declaration to the docket in this case and is therefore precluded from relying on it at present. (Am. Cmpl. [ECF No. 58] at Ex. A.)

64.    Mr. Grecco reserved ownership of all copyrights in all of the Copyrighted Works, and he only licensed, but did not assign or transfer, them to any of the movie or TV studios that paid him to create the images. Grecco Decl. ¶ 20. Those licenses have expired. *Id.* No studio has ever claimed that it, as opposed to Mr. Grecco or his assignee, MGPI, owns any of the Copyrighted Works. Grecco Decl. ¶¶ 12, 20.

**Defendants' Response:** Disputed. Plaintiff *claims* to have reserved ownership of all copyrights in the allegedly copyrighted works at issue; however, discovery revealed that Plaintiff may not in fact be the copyright owner of the works. (Defendants' SUF ¶¶ 13, 75, 77; Am. Compl.

[ECF No. 58] ¶ 40 and Ex. B). On some of the images' original slide mounts, which Defendants' contributors provided them after commencement of this action, there is a copyright credit to the television networks and studios who commissioned the handout. (Defendants' SUF ¶ 78.)

65.    Mr. Grecco is a professional photographer; he is the principal and owner of the Plaintiff. Grecco Decl. ¶¶ 1-8.

**Defendants' Response:** Undisputed that Mr. Grecco is a photographer and the principal and owner of Plaintiff, a company he uses to license its photographs. (Am. Compl. [ECF No. 58] ¶ 8; Defendants' Motion for Summary Judgment at 3; Defendants' SUF ¶ 12.)

66.    Celebrity portraiture has been the primary, but not exclusive, focus of Mr. Grecco's photography career, and his work has appeared on numerous magazine covers and major advertising and other projects. Grecco Decl. ¶¶ 2-4, 9, 13.

**Defendants' Response:** Disputed and immaterial to the extent that Plaintiff's claim to Mr. Grecco having centered his photography career around celebrity portraiture, including features on magazine covers or in advertising projects, does not bear upon the alleged infringement and images at issue in this action, namely, 25 publicity stills of actors from television shows from the 1990s. (Defendants' Motion for Summary Judgment at 3-4.)

67.    Over the years, Mr. Grecco's work has appeared in publications including Time Magazine, Vanity Fair, Esquire, The Boston Globe, The Guardian, and Rolling Stone, among many others. Mr. Grecco is currently represented by Atlas Gallery and Iconic Images in London, the Anderson Yezerski Gallery in Boston, Modern Rocks Gallery in Austin, Texas, and The Photo Gallery, Halmstad, Sweden. Grecco Decl. ¶ 5.

**Defendants' Response:** Disputed and immaterial to the extent that Mr. Grecco's purported accomplishments and representation do not bear upon the alleged infringement and images at issue

in this action, namely, 25 publicity stills of actors from television shows from the 1990s. (Defendants' Motion for Summary Judgment at 3-4.)

68.    Mr. Grecco's work over the years on these projects resulted in numerous awards. He has been recognized internationally for high concept imagery, mastery of lighting, and powerful connections with my subjects across an extensive body of work encompassing fine art, celebrity portraiture, music, commercial, and editorial photography. Grecco Decl. ¶ 7.

**Defendants' Response**: Disputed and immaterial to the extent that any awards or recognition Mr. Grecco may have received do not bear upon the alleged infringement and images at issue in this action, namely 25 publicity stills of actors from television shows from the 1990s. (Defendants' Motion for Summary Judgment at 3-4.)

69.    Mr. Grecco transferred and assigned his numerous copyrights in the works he has authored to his production company, Plaintiff MGPI. Grecco Decl. ¶ 8. Plaintiff is the owner of the registered copyrights in each of the images at issue in this lawsuit (the "Copyrighted Works"). *Id.*

**Defendants' Response**: Disputed. Plaintiff *claims* that he is the owner of validly registered, assigned copyrights in the images at issue in this lawsuit, however, the images at issue are comprised of publicity stills of actors from television shows from the 1990s, for which discovery revealed that Plaintiff may not be the copyright owner. (Defendants' SUF ¶¶ 13, 75, 77; Am. Compl. [ECF No. 58] ¶ 40 and Ex. B.) On some of the images' original slide mounts, which Defendants' contributors provided them after commencement of this action, there is a copyright credit to the television networks and studios who commissioned the handout. (Defendants' SUF ¶ 78.)

70.     Due to their popularity, in Mr. Grecco's experience over many years, many of his images are often misappropriated through infringements by people and companies hoping to capitalize on their popularity without paying to obtain licenses. Grecco Decl. ¶ 10. As a result, Plaintiff has deemed it necessary to protect its interests in the valuable portfolio of copyrighted works it owns by enforcing its exclusive rights, in the hope that such efforts will reduce the rampant infringements of my works. *Id.*

**Defendants' Response:** Disputed and misleading to the extent that Plaintiff's noted practice of bringing protracted copyright infringement lawsuits over images earning marginal licensing fees—in this case a total of $275.98, or $137.99 after sharing out the contributors' portion, (Allsworth Decl. ¶ 109)—could also be framed as an abuse of the legal system in an effort to pressure the many defendants Plaintiff has faced to settle for a significantly greater amount than the images' licensing fees. *See, e.g.*, Order, *Michael Grecco Prods., Inc. v. Heinrich Bauer Verlag Beteiligungs GMBH*, No. 22-9441 (PGG) (S.D.N.Y. May 23, 2023) (noting settlement in case brought in November 2022); *Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52 (E.D.N.Y. 2021) (awarding $750 in statutory damages and refusing to award attorney's fees and costs considering the images were immediately removed upon notice and there were likely "little or no actual damages" in dispute originating over two years prior).

71.     Plaintiff has pursued copyright infringement lawsuits in only a fraction of the instances of infringing uses of its copyrighted works it has identified. Grecco Decl. ¶ 11. Pursuing copyright infringement claims to protect its exclusive rights is not, and has never been, a business purpose for Plaintiff. *Id.*

**Defendants' Response:** Disputed and misleading, to the extent that Plaintiff has filed at least 12 copyright infringement lawsuits in the past two years, denoting Plaintiff's status as a serial

litigator. (*See Michael Grecco Prods., Inc. v. TrekMovie.com, et al.*, 2-2023-cv-00028 (C.D. Cal.); *Michael Grecco Prods., Inc. v. Episode.Ninja, et al.*, 2-2023-cv-00026 (C.D. Cal.); *Michael Grecco Prods., Inc. v. Bauer Media Grp. LLC*, 1-2022-cv-09441 (S.D.N.Y.); *Michael Grecco Prods., Inc. v. Red Blue Media, Inc., et al.*, 2-2022-cv-07506 (C.D. Cal.); *Michael Grecco Prods., Inc. v. ImageSelect B.V.*, 2-2022-cv-07398 (C.D. Cal.); *Michael Grecco Prods., Inc. v. IMDB.com, et al.*, 2-2022-cv-06047 (C.D. Cal.); *Michael Grecco Prods., Inc. v. McKinnon Broad. Co., et al.*, 2-2022-cv-04346 (C.D. Cal.); *Grecco et al. v. Age Fotostock America, Inc., et al.*, 1-2022-cv-04363 (S.D.N.Y.); *Michael Grecco Prods., Inc. v. Paramount Global, et al.*, 2-2022-cv-02302 (C.D. Cal.); *Michael Grecco Prods., Inc. et al. v. Redbubble, Inc., et al.*, 2-2022-cv-02122 (C.D. Cal.); *Michael Grecco Prods., Inc. V. Al Dia Newspaper, Inc.*, 2-2021-cv-04907 (E.D. Pa.); *Michael Grecco Prods., Inc. v. RADesign, Inc., et al.*, 1-2021-cv-08381 (S.D.N.Y.). Plaintiff's copyright infringement lawsuits typically—as in this action, (Allsworth Decl. ¶¶ 109, 111)—center around images with marginal or insignificant licensing value, underscoring Plaintiff's apparent business model of suing to settle, in order to recover a more significant payout via such negotiations. Mr. Grecco has indeed acknowledged that infringement cases are a significant source of income for his company, and through his company to himself personally, making up 75 percent of his income. (Wolff 9/11 Decl. ¶ 7, Ex. N at 42:7-48:13.)

72.    Television and film studios often pay significant amounts to advertise and promote their shows and movies, and on occasion providing professional, high quality photography or other content is part of the investment studios make in order to obtain valuable advertising and promotional coverage from the publications they deem valuable to those marketing efforts. Grecco Decl. ¶ 14. In order to obtain high quality photographs and other media content, TV and movie production companies pay a significant amount to photographers and their studios such as Plaintiff.

*Id.* These transactions have substantial value, and that value is not measured by what a studio might charge a journal to pay for a photograph to accompany a promotional article. *Id.*

**Defendants' Response:** Disputed, as during the 1990s, Mr. Grecco was commissioned to create publicity stills, or "handouts," of television actors on-set. (Defendants' SUF ¶ 13 (citing Declaration of Nancy E. Wolff dated June 5, 2023 ("Wolff 6/5 Decl.") ¶ 7, Ex. E at 87:12-88:4, 116:24-117:8, Am. Compl. ¶ 11)). Handout photos, in turn, are provided to news organizations and media companies for free by studios when general access by the media is either denied or impossible. (Defendants' SUF ¶ 14.)

73.     The studios Mr. Grecco worked with always made clear that they were interested in getting publicity and marketing exposure through the limited, high end, potential publishers of the portraits. Grecco Decl. ¶ 15. Uncontrolled distribution and use of the images by anyone would risk cheapening the studios' valuable works, which would have been the opposite of the intent after investing so much to promote and market that work. *Id.*

**Defendants' Response:** Disputed, as Mr. Grecco has testified to the purpose of handout photos commissioned by studios being the widespread distribution of said photos for free to news organizations and media companies for promotional and marketing purposes. (Defendants' SUF ¶¶ 13-14; Wolff 6/5 Decl. ¶¶ 7, 9-10, Ex. E at 87:12-88:4, 116:24-117:8, 119:15-17.) The duplicate slide photos from that era were commissioned by studios expressly for these promotional purposes. (Wolff 6/5 Decl. ¶ 11, Ex. E at 117:10-13.)

74.     Plaintiff is not aware of a legitimate, common practice of collecting infringing and unlawful images for sale to publishers. Grecco Decl. ¶ 16.

**Defendants' Response:** Disputed and misleading to the extent that Defendants' have never argued that it is a common practice for archives to collect infringing or unlawful images for sale

to publishers, but rather that it is a common practice for archives to collect publicity stills from various eras of television history so that publishers may more easily access digital copies for publication. (Wolff 6/5 Decl. ¶ 12; Defendants' SUF ¶ 16.)

75.    Mr. Grecco has searched Alamy's website relating to this case and when he has input search terms on the alamy.com website the results have been extensive and very broad, mixing many different images. Grecco Decl. ¶ 17. In Mr. Grecco's experience, the alamy.com search result also gratuitously suggests other images that did not come back as the result of his search terms. *Id.* and Ex. 1.

**Defendants' Response:** Disputed, misleading, and immaterial that Mr. Grecco's alleged, and inherently biased, experience perusing the Alamy platform supposedly resulted in an extensive or broad return of mixed images. The Alamy platform acts as a search engine that responds to the entry by users of targeted keywords that tailor any search for specific content, returning low-resolution thumbnail images corresponding to the search. (Allsworth Decl. ¶¶ 15-16.) The Alamy platform does, however, offer nearly 350 million images and videos, with more than 100,000 images added per day from photographers and agencies source form 173 countries, (Allsworth Decl. ¶ 14), such that a user's inputted search may extend to a wide variety of content and image files.

Respectfully submitted,

Dated: New York, New York
        September 11, 2023

COWAN, DEBAETS, ABRAHAMS
& SHEPPARD LLP

By: /s/ Nancy E. Wolff
Nancy E. Wolff
Scott J. Sholder
CeCe M. Cole

nwolff@cdas.com
ssholder@cdas.com
ccole@cdas.com

*Attorneys for Defendants
Alamy Inc. and Alamy Ltd.*